**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

CHANA ADLER ON BEHALF OF HERSELF AND HER
MINOR CHILDREN,

                      Plaintiff,

      - against -

CHERYL FEDER IN HER CAPACITY AS THE TRUSTEE
OF THE SA 2021 IRREVOCABLE TRUST,

                    Defendant.

-------------------------------------------------------------------------x

Case No.  2:25-cv-2193

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Chana Adler ("Plaintiff"), by her attorney Lieberman and Klestzick, LLP,

alleges as follows for her complaint:

## INTRODUCTION

      1.      In 2021, Samuel Adler conveyed at least $1,171,082 of income and marital assets

to a newly formed SA 2021 Irrevocable Trust (the "SA Trust") and named his sister, Defendant

Cheryl Feder, as the trustee (in her capacity as trustee, "Defendant").

      2.      Although Samuel Adler alleges that the SA Trust was created by and at the

direction of both Samuel Adler and his wife, the Plaintiff Chana Adler, Plaintiff never agreed to

the creation of the SA Trust, the transfer of marital assets, or appointing Defendant as trustee.

      3.      The four minor children of Samuel Adler and Plaintiff are designated as the

beneficiaries (the "Beneficiaries") of the SA Trust.

      4.      Since its creation, Samuel Adler has used the SA Trust as his personal piggy bank

and has exclusively directed all financial transactions and withdrawals from the SA Trust in his

personal capacity and for his own personal interests.

      5.      The deposits and withdrawals into and out of the SA Trust since its inception

were made without the knowledge and consent of Plaintiff.

6.    Despite repeated formal requests from Plaintiff to Defendant, Plaintiff has been deprived of an accounting of the transactions associated with the SA Trust over the full period of its existence and kept in the dark as to where its assets have gone.

7.    While Samuel Adler and Defendant have failed to provide a lot of records to which Plaintiff is entitled (as allegedly a party to the SA Trust's formation and a parent of the Beneficiaries), information Plaintiff has obtained conclusively establishes that: (i) Samuel Adler with his attorneys and advisors engaged in a fraudulent conveyance of marital assets to the SA Trust without Plaintiff's consent, and (ii) Defendant has been negligent in administering the SA Trust and breached her fiduciary duties by, *inter alia*:

    a.  Refusing to provide information to Plaintiff;

    b.  Failing to exercise fiduciary duties of loyalty, care and prudence;

    c.  Giving Samuel Adler carte blanche control and authority over the trust, including (i) selecting attorneys and accountants to advise the trust, (ii) making all investment decisions, (iii) direct access to the trust bank account, and (iv) withdrawal of trust assets;

    d.  Failing to investigate or correct inappropriate investments or withdrawals by Samuel Adler;

    e.  Failing to take steps to preserve trust assets and records; and

    f.  Refusing to perform duties that Defendant was legally required to take as trustee, including protecting the interests of the Beneficiaries.

8.    With this action, Plaintiff seeks a full accounting of the SA Trust to ensure all

trust assets are recovered, and either (i) have the fraudulently-transferred assets returned to Samuel Adler and Plaintiff jointly as marital assets, or in the alternative, (ii) have Defendant return all assets to the SA Trust and/or have her compensate the SA Trust for all fraudulently transferred assets, and remove Defendant from her position as trustee and replace her with a neutral and qualified trustee to oversee all assets managed by the SA Trust going forward.

## PARTIES

9.  Plaintiff Chana Adler is a resident of Cedarhurst, New York.

10.  Defendant Cheryl (Chanie) Feder is a resident of Passaic, New Jersey and the named Trustee of the SA Trust.

## JURISDICTION AND VENUE

11.  This Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. §1332, as there is complete diversity among Plaintiff, a resident of the State of New York, and Defendant, a resident of the State of New Jersey, and the amount in controversy exceeds the sum or value of $75,000.00 excluding interests and costs.

12.  Pursuant to 28 U.S.C. §1391(b)(2), venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

13.  The Court has both general and specific personal jurisdiction over Defendant, as Defendant maintains a substantial connection to this state (including with Samuel Adler and other family members in New York generally) and this case arises out of Defendant's personal contacts and interactions with the SA Trust and Samuel Adler in New York.

## FACTUAL BACKGROUND

**A.  Plaintiff Chana Adler**

14.     Plaintiff Chana Adler has been married to Samuel Adler since 2007.  Samuel Adler filed for divorce in September 2022 in Nassau County, New York, and those proceedings are ongoing.[1]

15.     Plaintiff worked part-time or full-time throughout the marriage and contributed to the marital assets.

16.     Over the course of the marriage, Samuel Adler took near-exclusive control over all financial assets and financial decisions. But in the years leading up to the divorce, Samuel Adler was even more aggressive in that control as he moved nearly all marital assets (excluding the family home) to accounts that Plaintiff did not have access to or did not even know about.

17.     For example, Samuel Adler and Plaintiff would receive a direct deposit of paychecks into their joint account each pay period, but Samuel Adler would immediately move the money from both spouses' paychecks from their joint account into other accounts that Plaintiff did not have access to.

18.     Whenever Plaintiff questioned where their money was going, Samuel Adler would say "what, you don't trust me?"  This financial abuse persisted for years and continues to this day.

**B.  Samuel Adler**

19.     Samuel Adler has an MBA in Finance from NYU Business School.

20.     Throughout most of his career, Samuel Adler has worked as a financial adviser or

---

[1] *Samuel Adler vs. Chana Adler*, Index No. 801999/2022 (Nassau Sup. Ct., New York).

4

operations manager in connection with various businesses.  In such roles, Samuel Adler has become quite adept at creating various forms of entities, vehicles, policies, trusts and accounts, and moving assets around between them.

21.    Samuel Adler worked for a company called Beechwood for approximately five years.  His employment there culminated in the notorious Beechwood-Platinum scandals, which devolved into years of federal and state investigations, dozens of lawsuits brought by creditors and investors who lost hundreds of millions of dollars, the discovery of bribes made to government officials, and a number of parties being convicted and sentenced to prison.[2]

22.    Samuel Adler's communications were referenced in relation to the allegations against Beechwood in a number of these cases, and upon information and belief he was named personally as a defendant in his capacity as co-trustee for the Beechwood Global Distribution

---

[2] See, e.g., headlines from just the Wall Street Journal during the last few months of 2016, including: "Adviser With Ties to Hedge Fund Platinum Put Client Funds in It" (Sep. 17, 2016) *available at* https://www.wsj.com/articles/adviser-with-ties-to-hedge-fund-platinum-put-client-funds-in-it-1473997753?msockid=22242f2cf72d6b0510702188f64f6ad4; "Hedge Fund Platinum Partners to Pay Back Fraction of What Firm Owes" (Oct. 7, 2016) *available at* https://www.wsj.com/articles/platinum-partners-plans-to-repay-around-80-million-to-investors-1475859524?msockid=22242f2cf72d6b0510702188f64f6ad4; "Platinum Partners' Flagship Hedge Fund Files for Bankruptcy" (Oct. 19, 2016) *available at* https://www.wsj.com/articles/platinum-partners-flagship-hedge-fund-files-for-bankruptcy-1476890030?msockid=22242f2cf72d6b0510702188f64f6ad4; "Judge Freezes Platinum Partners' Assets Amid Allegations Firm 'Plundered' Oil-Platform Operator" (Oct. 27, 2016) *available at* https://www.wsj.com/articles/judge-freezes-platinum-partners-assets-amid-allegations-firm-plundered-oil-platform-operator-1477601989?msockid=22242f2cf72d6b0510702188f64f6ad4; "Authorities Allege $1 Billion Fraud at Platinum Partners" (Dec. 19, 2016) *available at* https://www.wsj.com/articles/platinum-partners-executives-charged-with-1-billion-securities-fraud-1482154926?msockid=22242f2cf72d6b0510702188f64f6ad4; and "Platinum Partners Fraud Case Has Investigators Casting Wide Net" (Dec. 22, 2016) *available at* https://www.wsj.com/articles/platinum-partners-fraud-case-has-investigators-casting-wide-net-1482436724?msockid=22242f2cf72d6b0510702188f64f6ad4.

Trust.[3]

23.     Senior executives at Beechwood and Platinum that Samuel Adler worked with were charged by the SEC with defrauding clients and collectively held liable to pay millions of dollars in disgorgement, interest and penalties.[4]

24.     After the Beechwood fiasco, Samuel Adler moved over to a role at Mobile Vascular Physicians ("MVP", also known as "K&H"), as did his colleague Crystal O'Sullivan and their boss.

25.     Upon information and belief, Samuel Adler served as a financial officer at MVP for approximately five years, alongside Crystal O'Sullivan, and under their boss from Beechwood.

---

[3] See, e.g., the October 7, 2019 opinion and order from the Court *In re Platinum-Beechwood Litigation*, 1-18-cv-6658-JSR (SDNY 2019) ("With respect to MSD Administrative: According to an organizational chart attached to a March 17, 2014 email from Feuer to Samuel Adler, MSD Administrative was an '[a]dministrative company for mercurial tasks.' For its limited services with these "mercurial tasks," MSD Administrative was paid significant service fees by the Beechwood Entities. These service fees were used to funnel money out of the Beechwood Entities in order to shield assets from creditors."); *United States v. Landesman*, 17 F. 4th 298, 325 (2d Cir 2021) ("Levy's involvement in the Black Elk scheme is further corroborated by the circumstantial evidence suggesting that he was responsible for directing the voting of Beechwood's Black Elk bonds. On July 28, 2014, Beechwood employee Samuel Adler wrote to Wilmington Trust, with a copy to Levy, stating that the Black Elk bonds held by BAM and BBIL were voting "consent without tendering." GA.750. The same day, Adler, with a blind copy to Levy, wrote to Nomura also stating that the Black Elk bonds held by BAM and BBIL were voting "consent without tendering." GA.753. Adler's open and blind copies to Levy, respectively, considered together with the evidence establishing that Levy was simultaneously working on Platinum's Black Elk investment while acting as Beechwood's CIO and that he was actively monitoring Beechwood's investment in Black Elk, supports an inference that Adler was voting Beechwood's Black Elk bonds "consent without tendering" based on instructions given to him by Levy").

[4] *See* "SEC Charges Former Investment Adviser Principal with Defrauding Clients" *available at* https://www.sec.gov/enforcement-litigation/administrative-proceedings/ia-6540-s and "SEC Charges Former Reinsurance and Investment Adviser Executives With Defrauding Clients" *available at* https://www.sec.gov/enforce/ia-6358-s.

26.     MVP was a completely different business than Beechwood but experienced an eerily similar ending; upon information and belief, the business partners cashed out huge sums of money in connection with a private equity transaction and loan from Sunflower Bank, and not long afterward the entire company went bankrupt, resulting in a number of ongoing litigations.

27.     Upon information and belief, Samuel Adler has employed his financial engineering schemes to marital assets, creating an unknown number of trusts, loans, accounts, insurance policies and legal entities, with money, ownership roles and other rights provided to his parents, siblings and/or personal friends.

28.     To the extent Plaintiff would ever discover and question any of these financial maneuvers, Samuel Adler would inexplicably assert that all of those funds and assets were not (or are no longer) marital property.

**C.  The SA Trust**

29.     Upon information and belief, the "SA" in the SA Trust name stands for Samuel Adler, the individual who established the SA Trust, evidently for his own personal purposes.

30.     In addition to the terms set forth in the SA Trust agreement, Samuel Adler and his attorney, Danielle Seid-Vazana, have both affirmed throughout the divorce proceedings that the four minor children of Samuel Adler and Plaintiff are the Beneficiaries of the SA Trust.  For example, in a letter dated December 9, 2022, Danielle Seid-Vazana stated that assets were transferred to the SA Trust, "naming the parties' children as irrevocable beneficiaries".

31.     The Defendant, Cheryl Feder, is Samuel Adler's sister.

32.     Defendant is a pre-school teacher. Upon information and belief, Defendant has no education, experience, training or other qualifications reasonably necessary to serve as a trustee,

7

properly administer a trust, manage trust assets, or make investment decisions for a trust.

33.    Upon information and belief, Samuel Adler nonetheless appointed Defendant as the Trustee of the SA Trust, rather than appointing a duly qualified and experienced professional, with the clear intent and purpose of retaining for himself unfettered access to the SA Trust, and complete control over all assets of SA Trust, in deliberate breach of the terms of the SA Trust agreement and in violation of applicable legal and tax requirements.

34.    Upon information and belief, through her complicity in the formation and operation of the SA Trust, and rubberstamping or actively facilitating Samuel Adler's illicit and self-dealing transactions with the assets of the SA Trust to the detriment of the Beneficiaries, Cheryl Feder has breached fiduciary duties of loyalty, care and prudence that she owes as the Trustee.

35.    Upon information and belief, Cheryl Feder has aided and abetted Samuel Adler's exploitation of the SA Trust to defraud: (i) a private equity firm, (ii) a national bank, (iii) a partner at his own company, (iv) his wife, the Plaintiff, and (v) his children, the Beneficiaries.

36.    Samuel Adler, the SA Trust, and Defendant have already been the subject of numerous legal claims and disputes.

37.    On March 29, 2024, Sunflower Bank sued Cheryl Feder in her capacity as the Trustee of the SA Trust in Civil District Court in Dallas, Texas, along with other named defendants.  The case relates to Samuel Adler and several business partners who sold a stake in their company MVP to private equity firm Housatonic Partners ("Housatonic") in December 2021.  Sunflower Bank made a loan of $27.6 million to MVP in connection with the Housatonic transaction.  Samuel Adler, acting through the SA Trust, along with a few partners in MVP,

cashed out approximately $47 million from the transaction. About a year after that transaction, MVP went bankrupt and defaulted on the loan, and they were all sued by Sunflower Bank for repayment of the loan. A copy of the Plaintiff's Amended Original Petition in that action is attached hereto (without the exhibits annexed thereto) as **Exhibit A**.[5]

38.     Another lawsuit was filed against Samuel Adler and against Cheryl Feder in her capacity as the Trustee of the SA Trust in New York Supreme Court in Nassau County by Eliezer Halpert, one of the former partners in MVP.  Halpert alleges that Samuel Adler, acting through the SA Trust, colluded with other partners at their company to defraud Halpert out of his rightful share of interests in the business and the Housatonic transaction.  The amended complaint in that action is attached hereto as **Exhibit B**.[6]

39.     While those cases address how Samuel Adler allegedly used the SA Trust to swindle a private equity firm, a national bank and a partner at his own company, this case is about the fraudulent formation of the SA Trust with a conveyance that Plaintiff did not consent to, and once formed, Defendant's complete dereliction of her fundamental duties and basic functions as Trustee, and her enabling Samuel Adler to misappropriate assets belonging to his wife and children.

40.     As detailed in the lawsuits referenced above, the SA Trust received a $1,171,082

---

[5] *See Sunflower Bank, N.A. vs. Miriam Feuer, Eliezer Halpert, Abraham Knoll, Crystal O'sullivan, Miriam Knoll in her capacity as the trustee of the MF Irrevocable Grantor Trust, and Cheryl Feder in her capacity as the Trustee of the SA 2021 Irrevocable Trust, Established Under the Agreement Dated October 8, 2021*, Case # DC-24-04797 (Dallas Cty., Texas).
[6] *See Eliezer Halpert v. Abraham Knoll, Miriam Knoll, Individually and in her capacity as the Trustee of the MF Irrevocable Grantor Trust, Mark Feuer, Miriam Feuer, Samuel Adler, Cheryl Feder in her Capacity as the Trustee of the SA 2021 Irrevocable Trust, Crystal O'sullivan, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC a/k/a 2174 Fb Ave LLC, and 120 Hicksville Rd LLC*, Index No. 612354/2024 (Nassau Sup. Ct., New York).

payment in connection with the Housatonic transaction in exchange for the sale of Samuel Adler's approximately 2.5% interest in the company he worked for.

41.    Upon information and belief, the Housatonic transaction was consummated on December 31, 2021, and in connection with the transaction, Samuel Adler received a payment of $1,171,082 on that date and had this amount wired directly from MVP to the SA Trust.  The payment was made to the SA Trust's account at Flagstar Bank (formerly known as Signature Bank).  It came from "SUNFLOWER BANK NA – LOAN OPS WIRE" (i.e., the bank involved in the Housatonic transaction) and it stated: "REFERENCE: MOBILE VASCULAR PHYSICIANS".

42.    Samuel Adler and Plaintiff were married at the time of that payment, and this entire amount was clearly income earned as joint marital property that belonged to both of them under New York law.

43.    In the years leading up to Samuel Adler's creation of the SA Trust, the marriage between Samuel Adler and Plaintiff Chana Adler had been rapidly deteriorating, in part due to financial abuse in which Samuel Adler exercised near-exclusive control over all marital assets.

44.    Samuel Adler unilaterally formed the SA Trust in October or November 2021 and secretly embezzled (or, as he called it, "gifted") marital income into the SA Trust, without the knowledge or consent of his spouse, Plaintiff Chana Adler.

45.    Upon information and belief, unbeknownst to Plaintiff at the time, Samuel Adler directed Kenneth Renov at Korsinsky and Klein LLP ("Korsinsky and Klein" or the "Attorneys") to create the SA Trust and prepare the SA Trust agreement.

46.    Korsinsky and Klein's retainer agreement dated November 1, 2021 with respect to

10

the SA Trust is addressed to "Mr. and Mrs. Adler" and the introductory paragraph starts with "It was a pleasure meeting with you to discuss your Life & Estate Planning..."  Paragraph 1 regarding "Nature of Services" states that "Mr. Samuel Adler and Mrs. Chana Adler (collectively, the "Client") hereby retain Korsinsky and Klein, LLP (the "Firm") to perform the following services: …"  The signature page of the retainer agreement has a place for "Mr. Samuel Adler or Mrs. Chana Adler" to sign.

47.     Therefore, according to Korsinsky and Klein's retainer agreement, Plaintiff was their "client".  However, Korsinsky and Klein never actually met with or spoke to Plaintiff, nor did Korsinsky and Klein ever give Plaintiff an opportunity to review the SA Trust agreement.  Korsinsky and Klein performed all of their work on this matter solely and exclusively with Samuel Adler, without ever including Plaintiff in any aspect of forming the SA Trust and preparing the SA Trust agreement.

48.     Plaintiff never received the Korsinsky and Klein retainer agreement before the creation of the SA Trust, and never signed it.

49.     Forming the SA Trust and transferring substantial amounts of marital assets into the SA Trust was obviously a very important financial decision for the family, as a very large portion of their assets would now be exclusively held within the SA Trust for the benefit of the designated Beneficiaries, and subject to the terms of the SA Trust agreement as well as applicable legal and tax requirements.  Yet, Samuel Adler deliberately implemented all of this without Plaintiff and completely excluded her from the entire process.

50.     Plaintiff was never given a copy of the SA Trust agreement before it was created, and Plaintiff never signed the SA Trust agreement.

51.     Defendant, as trustee of the SA Trust, had a duty to ensure any funds provided to the SA Trust were lawfully provided with all necessary authorizations, but failed to do so.

52.     After years of discovery and requests in the divorce proceedings, Samuel Adler finally produced a copy of the SA Trust agreement dated ***November 15, 2021***.  However, as referenced above, the *Sunflower* lawsuit was brought against "Cheryl Feder in her capacity as the Trustee of the SA 2021 Irrevocable Trust, Established Under the Agreement Dated ***October 8, 2021***" (emphasis added).

53.     It therefore appears that there was an earlier version of the SA Trust agreement dated October 8, 2021 and that Defendant and/or Samuel Adler subsequently amended the agreement on November 15, 2021.[7]

54.     Upon information and belief, Samuel Adler also relied on his advisor Nissan Lebowitz, a partner at Levine & Schmutter CPA LLP ("Levine & Schmutter" or the "Advisors") to set up and service the SA Trust.  Samuel Adler has also used the Advisors for various other personal and business matters.  None of the Advisors solicited or received authorization from Plaintiff regarding the SA Trust.

55.     Upon information and belief, without Plaintiff's knowledge or consent, Samuel Adler, together with the Attorneys and Advisors, proceeded to unlawfully create the SA Trust and transfer to Defendant as trustee well over one million dollars of marital assets via a bank account opened in the name of the SA Trust at Flagstar Bank (formerly known as Signature Bank).

---

[7] It is unclear how an SA Trust agreement could be dated ***October 8***, 2021, if the retainer agreement from Korsinsky and Klein addressed to Samuel Adler and Plaintiff is dated ***November 1***, 2021.

56.    Upon information and belief, from the months of June through September of 2022, the months right before Samuel Adler filed for divorce, the SA Trust transferred approximately $250,000 in a series of deposits and withdrawals to a bank account belonging to Rochel Adler, the mother of Samuel Adler and Defendant Cheryl Feder.  During that same period, the SA Trust also transferred approximately $250,000 to Michael Taubenblat, a friend of Samuel Adler.

57.    Upon information and belief, in addition to the $1,171,082 payment from the Housatonic transaction, Samuel Adler has also transferred into the SA Trust various other assets and business interests accrued during the course of their marriage.

58.    For example, in connection with his employment at MVP and the operations of the business, Samuel Adler received interests in the following three real estate properties: (i) 64-57 Woodhaven Blvd LLC; (ii) 2174 Flatbush Ave LLC a/k/a 2174 Fb Ave LLC; and (iii) 120 Hicksville Rd LLC. These assets were not disclosed to Plaintiff in the divorce proceedings, but one of the pending lawsuits relating to MVP provides a snapshot of the owners in certain properties and Samuel Adler (in his personal capacity) is publicly identified as a "5% owner".

59.    Upon information and belief, Samuel Adler received a 5% interest in this LLC and similar interests in the other two LLCs in connection with his employment at MVP during his marriage.  Plaintiff jointly owned these LLC interests under New York law.

60.    Upon information and belief, at some point in 2021, Samuel Adler transferred the interests in these LLCs to the SA Trust, again, without Plaintiff's knowledge or consent. Similar to the payment from the Housatonic transaction, Samuel Adler made these transfers to the SA Trust before commencing divorce proceedings.

61.    All of these assets were accrued by Samuel Adler during the course of his employment at MVP and while married to Plaintiff.

**D.  Other Schemes Implemented Along with the Sham Trust**

62.    Upon information and belief, along with the fraudulent creation of the SA Trust, Samuel Adler with his Attorneys and Advisers carried out a number of related schemes in the months leading up to Samuel Adler's divorce filing, with the willing participation of various members of his family.

63.    Upon information and belief, Samuel Adler "loaned" his father, Harry Adler, approximately $200,000 to pay for the monthly premiums on an expensive life insurance policy that they suddenly decided to purchase in 2021. It is unclear how Samuel Adler was able to loan thousands of dollars every month to his father for policy premiums despite representing to the divorce court that he lacks sufficient funds to afford his own family's basic living expenses.

64.    Upon information and belief, in 2018, Samuel Adler and Plaintiff acquired an investment property in New Jersey, together with Samuel Adler's brother, Israel Adler.  Samuel Adler and Plaintiff had contributed most of the capital for the property with marital assets, while Israel Adler was supposedly the "operating partner" taking care of the property, although Israel Adler got married and moved with his partner to Massachusetts.  The property was rented out and had been earning rental income every month.

65.    Without Plaintiff's knowledge or consent, upon information and belief, Samuel Adler and Israel Adler conspired together to secretly sell the property and then split $140,000 in profits from the sale.  Samuel Adler filed for divorce just days after selling the property and splitting the proceeds with his brother.  Even though Plaintiff was a party and signatory to the

original purchase agreement for the property and it was clearly a jointly owned marital property, Samuel Adler and Israel Adler deliberately excluded Plaintiff from both the decision to sell the property and from the distribution of proceeds from the sale. After Plaintiff later learned about the sale, she also learned that Samuel Adler immediately spent his $70,000 share to pay off his student loans and for other personal purposes.

66.    These fraudulent transactions demonstrate that the SA Trust was just another vehicle to conceal from Plaintiff and the Beneficiaries the assets to which they are entitled.

**E.  Commencement of Divorce Proceedings**

67.    Upon information and belief, fully aware that Samuel Adler and Plaintiff were heading for divorce, Defendant knowingly and recklessly agreed to serve as a "Trustee" in name only, and allowed Samuel Adler to fraudulently transfer substantial amounts of marital property into the SA Trust to "shield" it from equitable distribution in the divorce proceedings that he planned to commence.

68.    Upon information and belief, Defendant has at all times allowed Samuel Adler to treat the SA Trust as his personal piggy bank and engage in illicit and self-dealing transactions.

69.    In September 2022, less than a year after forming the SA Trust, and after moving and/or hiding most marital assets from Plaintiff, Samuel Adler filed for divorce against Plaintiff and commenced litigation proceedings.

70.    Concurrent with filing for divorce, Samuel Adler changed passwords and locked Plaintiff out of any accounts she did know about, except for one joint account in which he leaves no more than a few hundred dollars at any point in time.

71.    Defendant violated a fiduciary duty of full disclosure by withholding from

Plaintiff basic information and records relating to the SA Trust.  The funds contributed to the SA Trust were taken from marital assets without Plaintiff's knowledge or consent.  Plaintiff is also a parent and guardian of the Beneficiaries, all four of whom are currently minors under the age of 18, and Plaintiff is therefore entitled to receive and review trust documents, bank statements, tax returns and other relevant information and records relating to the SA Trust. Defendant has nonetheless provided all such access to Samuel Adler while stonewalling legitimate requests for such information and records from Plaintiff.

72.    The divorce proceedings have now been going on for over two and a half years. Samuel Adler has refused to grant Plaintiff a *Get* (i.e., a Jewish writ of divorce) in accordance with New York and Jewish laws, despite Plaintiff making at least three formal requests for a *Get* through a certified Beth Din.

73.    By enabling Samuel Adler to create the fraudulent SA Trust, and then access and spend its assets in his sole discretion, along with other funds taken from jointly held marital assets, Defendant has inflicted extreme financial and emotional harm on Plaintiff and the Beneficiaries.

74.    In connection with the divorce proceedings, Plaintiff sought formal discovery from both Samuel Adler and Defendant regarding the SA Trust, and in response both Samuel Adler and Defendant withheld significant responsive information and documents.

75.    For example, as one alleged excuse for Samuel Adler's refusal to provide relevant information about the SA Trust, Samuel Adler's attorney Danielle Seid-Vazana in a letter dated March 21, 2023 asserted that "[a]s it relates to the irrevocable trust, your client has no rights to this asset as same is not marital…In addition, the trustee of the trust has advised me that the trust

16

will retain separate counsel, and its interests will be vigorously defended if your client wishes to pursue this issue."

76.     As Samuel Adler refused to provide the requested information, Plaintiff then delivered multiple formal written requests and ultimately a subpoena to Defendant to provide the relevant information and records relating to the SA Trust.

77.     Upon information and belief, the law firm of Harris Beach PLLC ("Harris Beach") was retained, at Samuel Adler's direction, to represent Defendant in relation to her role as trustee of the SA Trust.

78.     Harris Beach first requested an extension of time to respond to the subpoena. After being granted an extension Harris Beach then objected to most of the discovery requests.

79.     Consequently, Harris Beach first delayed for months claiming that they needed more time to review and collect all the documents for production and then obstructed by refusing to produce most of the requested documents despite the court-ordered subpoena.

80.     In addition, to intimidate Plaintiff from lawfully requesting information regarding the SA Trust from Defendant, Samuel Adler has threatened Plaintiff on multiple occasions that he will retaliate against her siblings by filing ethics complaints against her two brothers, who happen to be attorneys, with the New York Attorney Disciplinary/Grievance Committee.

**F.  The SA Trust is a Sham**

81.     The SA Trust is a sham trust.  Defendant Cheryl Feder is a sham trustee.  And virtually every transaction that Samuel Adler carried out through the SA Trust has been a sham.

82.     This is an action for, *inter alia*, conversion of property, fraudulent transfers, breach of duty of loyalty, breach of duty of care and prudence, breach of duty to obey the trust

agreement, and failure to provide an accounting, all knowingly and/or recklessly committed by Defendant Cheryl Feder in her capacity as the Trustee of the SA Trust.

## FIRST CAUSE OF ACTION
### (Conversion of Property)

83.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if set forth fully herein.

84.    On at least several known instances, the Defendant, in her capacity as trustee, has converted Plaintiff's funds.

85.    For instance, Samuel Adler and Plaintiff Chana Adler were married at the time Samuel Adler received a payment of $1,171,082 from his employer and this entire amount was marital income and assets, and therefore joint marital property that belonged to both of them under New York law.

86.    Similarly, the Defendant converted Plaintiff's interests in the LLCs, which were transferred to the SA Trust without Plaintiff's knowledge or consent.

87.    Plaintiff, not the Defendant, is a rightful owner of her marital income and assets.

88.    Defendant has unlawfully exercised dominion and control over funds and assets owned by Plaintiff by taking Plaintiff's funds without her knowledge.

89.    Plaintiff has legal ownership or an immediate superior right of possession to the funds that Defendant is wrongfully withholding.

90.    Defendant's actions constitute a conversion and misappropriation of Plaintiff's assets.

91.    As a result of the foregoing, Plaintiff has been damaged.

92.    Accordingly, Plaintiff is entitled to an order directing the return of all assets

wrongfully converted by the Defendant and rightfully belonging to Plaintiff and/or her marital

estate, as well as compensatory and punitive damages in an amount to be further determined at

trial, plus applicable fees, interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
### (Void Fraudulent Transfers)

93.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if

set forth fully herein.

94.    Defendant facilitated the fraudulent transfer of marital assets ***into*** the SA Trust to

further Samuel Adler's scheme without knowledge or consent of Plaintiff.

95.    The fraudulent transfers were made with constructive or actual intent to hinder,

delay, and defraud the Plaintiff, Samuel Adler's wife.

96.    Defendant knowingly compounded the fraud by giving Samuel Adler direct

access to the SA Trust funds and free reign to routinely transfer assets ***out of*** the SA Trust

however he saw fit, including to pay his own personal taxes, make loans to related parties, spend

money in various investment pursuits, and potentially for other purposes.

97.    Accordingly, Plaintiff is entitled to an order unwinding all fraudulent transfers

made by and to the Defendant, in an effort to defraud Plaintiff, as well as compensatory and

punitive damages in an amount to be further determined at trial, plus applicable fees, interest,

attorneys' fees, and costs.

## THIRD CAUSE OF ACTION
### (Breach of Duty of Loyalty)

98.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if

set forth fully herein.

99.    Defendant, as trustee of the SA Trust, owed fiduciary duties of good faith and undivided loyalty to the Beneficiaries.

100.    Defendant grossly disregarded her fiduciary duties by permitting Samuel Adler carte blanche to access and use assets of the SA Trust.

101.    Defendant's failure to investigate and remediate the inappropriate conduct of Samuel Adler in accessing and using assets of the SA Trust breached her fiduciary duties to the Beneficiaries.

102.    Defendant also breached her fiduciary duties by failing to keep and provide all relevant records relating to the SA Trust, as required by the SA Trust agreement and New York law.

103.    Additionally, in connection with her fiduciary duties, Defendant was strictly prohibited from engaging in transactions that involve self-dealing or that otherwise involved a conflict between her fiduciary duties and personal interests.

104.    Defendant egregiously breached her fiduciary duties by putting her personal interests, and her brother Samuel Adler's, over the interests of the Beneficiaries.

105.    As one further example of the self-dealing and conflicts of interest facilitated by Defendant, she permitted Samuel Adler to take $175,000 out of the SA Trust as a "personal loan" which he told Plaintiff was needed to pay his personal income taxes for 2021. According to a one-page "promissory note" for the loan, interest was set at a fixed rate of 1.87% per annum, which is obviously a bad investment for the SA Trust given that it was even lower than basic interest offered by a bank savings account, and significantly lower than relatively safe investments in diversified mutual or index funds.

106.    Collectively, the incredible series of blatant financial shenanigans that Defendant has facilitated as trustee of the SA Trust to the direct benefit of her brother, parents and other recipients of the funds depicts an egregious display of self-dealing and conflicts of interest to the detriment of Plaintiff and the Beneficiaries.

107.    Defendant's breaches of her fiduciary duties resulted in substantial monetary damage to the Beneficiaries in excess of $75,000.

108.    Therefore, Plaintiff is entitled to compensatory damages, as well as punitive damages, in an amount to be determined at trial with interest, attorney's fees, and costs.

109.    Additionally, Plaintiff is entitled to injunctive relief restraining the Trustee from misappropriating the funds rightfully belonging to the SA Trust.

110.    Furthermore, the Court should remove Defendant as the trustee of the SA Trust.

<strong><u>FOURTH CAUSE OF ACTION</u></strong><br><strong>(Breach of Duty of Care and Prudence)</strong>

111.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if set forth fully herein.

112.    As trustee, Defendant had a duty of care and prudence, which required her to administer the SA Trust with the exercise of reasonable care, skill, and caution.

113.    Throughout her time as Trustee, Defendant completely breached her duty of care and prudence.

114.    Aside from SA Trust funds transferred directly into accounts belonging to members of the Adler family and their friends, the other "investments" that the SA Trust made appear to be "loans" to LLCs and other business entities that are owned or controlled by Samuel Adler, other members of the Adler family and their friends.

115.    Defendant, as trustee, failed to conduct any due diligence on these "investments" or engage in any prudence that would subjectively or objectively be exercised by a trustee in the fulfillment of the duties.

116.    Defendant instead allowed Samuel Adler to make all "investment" decisions for the SA Trust, frequently to his direct or indirect benefit, in breach of the terms of the SA Trust agreement and in violation of applicable legal and tax requirements.

117.    Defendant is not acting as a lawful trustee and operates as trustee in title only, in other words, a sham trustee, while allowing Samuel Adler to subvert the entire purpose of the SA Trust and its obligations to the Beneficiaries. Defendant has therefore failed to fulfill her fiduciary duties and statutory responsibilities as a trustee.

118.    Therefore, Plaintiff is entitled to compensatory damages, as well as punitive damages, in an amount to be determined at trial with interest, attorney's fees, and costs.

119.    Additionally, Plaintiff is entitled to injunctive relief restraining the Trustee from misappropriating the funds rightfully belonging to the SA Trust.

120.    Furthermore, the Court should remove Defendant as the trustee of the SA Trust.

## FIFTH CAUSE OF ACTION
### (Breach of Duty to Obey Trust Agreement)

121.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if set forth fully herein.

122.    As trustee, the Defendant had a legal duty to obey and carry out the terms of the SA Trust agreement, and to diligently administer the SA Trust in good faith in accordance with the terms of the SA Trust and applicable law.

123.    By allowing the SA Trust to be abused for the benefit of Samuel Adler, her

parents, and other non-beneficiaries, Defendant breached her duty to obey the terms of the SA Trust agreement.

124.    Samuel Adler is not legally permitted to engage in any transactions involving the assets of the Trust.

125.    Indeed, according to the SA Trust agreement, neither the principal nor any of the income derived therefrom was to ever be payable to Samuel Adler or used to discharge any obligation of Samuel Adler. Furthermore, the SA Trust agreement provides that it was the trustee who was to have sole and absolute discretion in exercising its powers.

126.    Defendant violated the SA Trust agreement by ignoring the trust requirements and enabling Samuel Adler to directly execute or direct the execution of numerous transactions using trust funds.

127.    Therefore, Plaintiff is entitled to compensatory damages, as well as punitive damages, in an amount to be determined at trial with interest, attorney's fees, and costs.

128.    Additionally, Plaintiff is entitled to injunctive relief restraining the Trustee from misappropriating the funds rightfully belonging to the SA Trust.

129.    Furthermore, the Court should remove Defendant as the trustee of the SA Trust.

## SIXTH CAUSE OF ACTION
### (Failure to Provide Accounting)

130.    Plaintiff repeats and re-alleges all the allegations in the preceding paragraphs as if set forth fully herein.

131.    As noted above, as Trustee, the Defendant owes fiduciary duties to Plaintiff and the Beneficiaries.

132.    Defendant has kept the financial affairs of the SA Trust secret and has refused to

disclose them to Plaintiff.

133.    Plaintiff is not aware of all the amounts of money and other property received by Defendant on behalf of the SA Trust, except as mentioned above.

134.    Upon information and belief, Defendant, her family members and other related parties have received income from the SA Trust without Plaintiff's knowledge.

135.    Upon information and belief, Defendant, her family members and other related parties have personally benefitted from the SA Trust without Plaintiffs' knowledge.

136.    Plaintiff is not aware of all the purposes for which Defendant has used the money and property.

137.    Upon information and belief, Plaintiff is entitled to a large sum of money and other assets from Defendant to be returned to the SA Trust.

138.    The actions of Defendant have shown a reckless and wanton indifference to the rights of Plaintiff and the Beneficiaries, and the terms of the SA Trust agreement which have been flagrantly violated.

139.    Plaintiff has demanded an accounting.

140.    To date, Defendant has failed to provide an accounting.

141.    Any further demand would be futile.

142.    In light of the foregoing, Plaintiff is entitled to an Order and Judgment compelling an accounting of all assets and income of the SA Trust from its inception, along with incidental and/or consequential damages.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests judgment against Defendant as follows:

A.     Awarding Plaintiff compensatory damages, the precise amount to be determined at trial, in an amount totaling no less than $1 million exclusive of interest and costs;

B.     Awarding Plaintiff punitive damages in the amount of $1 million;

C.     Removing the Defendant as Trustee of the SA Trust;

D.     Directing the Defendant to provide a full and complete accounting including, without limitation, of any assets transferred into, or out of, the SA Trust;

E.     Permanently enjoining Defendant from serving as trustee of any marital assets or any assets on behalf of the Beneficiaries;

F.     Awarding Plaintiff her attorneys' fees, costs, and disbursements of this action; and

G.     Granting such other and further relief as the Court deems just and proper.

Dated:  April 21, 2025
        Lynbrook, New York

                                    **LIEBERMAN AND KLESTZICK, LLP**
                                    *Attorneys for Plaintiff*

                                    By: */s/ Abraham Beinhorn*
                                         Abraham S. Beinhorn, Esq.
                                    381 Sunrise Hwy, Suite 302
                                    Lynbrook, New York 11563
                                    Tel: (516) 400-1208
                                    Email: abraham@landklegal.com

25

# EXHIBIT "A"

FILED
7/15/2024 10:31 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Faith Livingstone DEPUTY

CAUSE NO. DC-24-04797

| | | |
|---|---|---|
| SUNFLOWER BANK, N.A., | § | IN THE 68th DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | OF |
| | § | |
| VMC TECHCO, LLC, VMC BILLCO, LLC, | § | |
| VASCULAR MANAGEMENT | § | |
| CONSULTANTS, LLC, MIRIAM FEUER, | § | |
| ELIEZER HALPERT, ABRAHAM | § | |
| KNOLL, CRYSTAL O'SULLIVAN, | § | |
| MIRIAM KNOLL IN HER CAPACITY AS | § | |
| THE TRUSTEE OF THE MF | § | |
| IRREVOCABLE GRANTOR TRUST, AND | § | |
| CHERYL FEDER IN HER CAPACITY AS | § | |
| THE TRUSTEE OF THE SA2021 | § | |
| IRREVOCABLE TRUST, ESTABLISHED | § | |
| UNDER THE AGREEMENT DATED | § | |
| OCTOBER 8, 2021, HOUSATONIC | § | |
| EQUITY INVESTORS VII, L.P., AND | § | |
| HOUSATONIC EQUITY AFFILIATES VII, | § | |
| L.P., | § | |
| | § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF SUNFLOWER BANK, N.A.'S AMENDED ORIGINAL PETITION

Plaintiff Sunflower Bank, N.A. ("Sunflower") files this Amended Petition complaining of

Defendants VMC Techco, LLC ("Techco"), VMC Billco, LLC ("Billco"), Vascular

Management Consultants, LLC ("VMC"), Miriam Feuer ("Feuer"), Eliezer Halpert ("Halpert"),

Abraham Knoll ("Knoll") and Crystal O'Sullivan ("O'Sullivan") ("collectively, the "Individual

Guarantors"), Miriam Knoll in her capacity as the Trustee of the MF Irrevocable Grantor Trust

Established under the Agreement dated July 3, 2019 ( "M. Knoll Trustee") and Cheryl Feder in

her capacity as the Trustee of the SA2021 Irrevocable Trust Established under the Agreement

dated October 8, 2021 ("C. Feder Trustee" and together with M. Knoll Trustee the "Trust

Guarantors"), Housatonic Equity Investors VII, L.P. ("Housatonic Inv.") and Housatonic Equity

Affiliate VII, L.P. ("Housatonic Aff.") (collectively, "Defendants"), and for this cause of action, Sunflower would show the Court as follows:

## LEVEL 2 DISCOVERY CONTROL PLAN

1.      The amount in controversy exceeds $250,000.00, and therefore, discovery in this case shall be governed by a Level 2 discovery control plan in accordance with Rule 190.3 of the Texas Rules of Civil Procedure.

## AMOUNT IN CONTROVERSY

2.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Sunflower asserts that this case involves monetary relief over $1,000,000.00.

## PARTIES

3.      Sunflower is a national banking association with its main office located at 1400 16th Street, Denver, Colorado 80202.

4.      Techco is a Delaware limited liability company doing business in Texas by entering into contracts performable in whole or in part in the State of Texas.  Techco can be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

5.      Billco is a Delaware limited liability company doing business in Texas by entering into contracts performable in whole or in part in the State of Texas.  Billco can be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

6.      VMC is a Delaware limited liability company doing business in Texas by entering into contracts performable in whole or in part in the State of Texas.  VMC can be served with process by serving its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

7.      Feuer is, on information and belief, an individual resident of New York who is doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and who can be served with process at her usual residence address located at One Beachwood Drive, Lawrence, New York 11559.  The last three digits of Feuer's social security number are 378, and the last three digits of her driver's license number are 423.

8.      Halpert is, on information and belief, an individual resident of New York who is doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and who can be served with process at his usual residence address located at 330 Elm Street, West Hempstead, New York 11552.  The last three digits of Halpert's social security number are 823, and the last three digits of his driver's license number are 700.

9.      Knoll is, on information and belief, an individual resident of New York who is doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and who can be served with process at his usual residence address located at 350 Roselle Avenue, Cedarhurst, New York 11516.  The last three digits of Knoll's social security number are 688, and the last three digits of his driver's license number are 098.

10.     O'Sullivan is, on information and belief, an individual resident of New York who is doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and who can be served with process at her usual residence address located at 6 Birchwood Drive, Great River, New York 11739.  The last three digits of O'Sullivan's social security number are 073, and the last three digits of her driver's license number are 065.

11.     M. Knoll Trustee is, on information and belief, an individual resident of New York who is doing business in Texas, by among other things, entering into contracts that are

performable in whole or in part in Texas, and who can be served with process at her usual residence address located at 350 Roselle Avenue, Cedarhurst, New York 11516. The last three digits of M. Knoll Trustee's social security number are 688, and the last three digits of her driver's license number are 098.

12.    C. Feder Trustee is, on information and belief, an individual resident of New Jersey who is doing business in Texas, by and among other things, entering into contracts that are performable in whole or in part in Texas, and who can be served with process at her usual residence address located at 2 Stewart Street, Passaic, New Jersey 07055. The last three digits of C. Feder Trustee's social security number are 257, and the last three digits of her driver's license number are unknown.

13.    Housatonic Inv. is a Delaware limited liability partnership doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and that can be served with process through its registered agent Barry Reynolds, 1 Post St. Ste. 2600, San Francisco, California 94104-5230.

14.    Housatonic Aff. is a Delaware limited liability partnership doing business in Texas, by among other things, entering into contracts that are performable in whole or in part in Texas, and that can be served with process through its registered agent Barry Reynolds, 1 Post St. Ste. 2600, San Francisco, California 94104-5230.

## JURISDICTION

15.    Jurisdiction is proper in this Court because the amount in controversy exceeds the minimum jurisdictional limits of the Court.

## VENUE

16.    Pursuant to Texas Civil Practice & Remedies Code §15.020, venue is mandatory in Dallas County because this case involves a "major transaction," as that term is defined in Texas Civil Practice & Remedies Code §15.020(a), and the Credit Agreement and the Guaranties (as those terms are defined below) expressly provide for venue in Dallas County.  Alternatively, venue in Dallas County is proper pursuant to Texas Civil Practice & Remedies Code §15.002(a) because all or a substantial part of the events or omissions giving rise to the claim occurred in Dallas County, and pursuant to Texas Civil Practice & Remedies Code §15.035(a) because this case involves obligations in a written contract that are performable in Dallas County, Texas.

## FACTUAL BACKGROUND

*The Borrowers and the Loan*

17.    Each of Techco, Billco and VMC (collectively, "Borrowers") is a physician management company that provides services or equipment to K&H Medical PLLC, K&H Medical-NJ PLLC, K&H Medical (CT) PLLC and related entities (collectively, "K&H"). K&H are in turn medical practices that employ physicians, physician assistants, and nurses that provide medical treatment, and specifically, vascular related treatment, to patients, and that collect revenue from insurance payors and patients.  K&H are owned by Halpert and Knoll, and the Borrowers have no ownership interest in K&H.

18.    Moshe (Mark) Feuer ("M. Feuer") is the spouse of Feuer.  M. Feuer was the founder of VMC and, at all material times, the Chief Executive Officer and Chairman of VMC and the managing member of Billco and Techco.  M. Feuer was also the Chief Executive Officer Holdco, the sole member of VMC.  M. Feuer was previously under investigation, and is now currently subject to an SEC cease and desist order, for his participation in a fraudulent

reinsurance and investment advisory scheme, which upon information and belief, is why his ownership of the Borrowers was vested in his wife.

19.      Knoll and M. Feuer are members of the Board of Holdco.  Borrowers do not have their own boards and are managed by Holdco through its board.

20.      Pursuant to a Credit Agreement dated as of December 31, 2021 (the "Original Credit Agreement"), by and between Sunflower, as Administrative Agent, and Techco, Billco, and VMC, as Borrowers, Sunflower agreed to make a term loan of up to $27,620,000.00 to Borrowers (the "Loan") subject to the terms set forth therein.  A true and correct copy of the Original Credit Agreement is attached hereto as Exhibit "A."

21.      The Loan is also evidenced by a Term Loan Note dated December 31, 2021, executed by Borrowers and payable to the order of Sunflower (the "Note").  A true and correct copy of the Note is attached hereto as Exhibit "B."

22.      Sunflower provided the Loan in connection with the acquisition of a portion of the direct and indirect equity interests in Borrowers by Housatonic Inv., Housatonic Aff. and related entities (collectively, "Housatonic").

23.      Each of the Individual Guarantors and Trust Guarantors owned portions of the equity interests in Holdco, the sole member of VMC, that were acquired by Housatonic, and each of the Individual Guarantors and Trust Guarantors continue to own indirect equity interests in Borrowers.  When the Loan closed on December 31, 2021, the Individual Guarantors and Trust Guarantors distributed roughly $47,000,000.00 from the acquisition payments to themselves.

*The First and Second Amendment and the Guarantees*

24.      The Original Credit Agreement was modified pursuant to the terms of a First Amendment to Credit Agreement and Limited Waiver dated December 30, 2022, by and

between Borrowers, as Borrowers, and Sunflower, as Administrative Agent (the "First Amendment"). Several guaranties of the Loan were provided in connection with the First Amendment.

25.    All of the indebtedness and obligations of Borrowers under the Original Credit Agreement and any modification and amendments to same, under the Note and under the other Loan Documents (as that term is defined in the Original Credit Agreement) are absolutely and unconditionally guaranteed by the Individual Guarantors and Trust Guarantors, jointly and severally, in accordance with the terms of a Limited Guaranty dated as of December 30, 2022, (the "Individual Guaranty"). A true and correct copy of the Individual Guaranty is attached hereto as Exhibit "C."

26.    All of the indebtedness and obligations of Borrowers under the Original Credit Agreement and any modification and amendments to same, under the Note and under the Loan Documents are also absolutely and unconditionally guaranteed by Housatonic Inv. and Housatonic Aff., jointly and severally, in accordance with the terms of a Limited Guaranty dated as of December 30, 2022 (the "Housatonic Guaranty"). A true and correct copy of the Housatonic Guaranty is attached hereto as Exhibit "D."

27.    Pursuant to the terms of the Individual Guaranty, the aggregate obligations of the Individual Guarantors and Trust Guarantors are limited to the "Guaranteed Amount" equal to the sum of an "Initial Guaranteed Amount" of $2,000,000.00 plus the "Adjustment Amount" for the most recently ended fiscal quarter. The obligations of O'Sullivan are further limited to 1.25% of the Guaranteed Amount, and the obligations of C. Feder Trustee are limited to 2.5% of the Guaranteed Amount. The Adjustment Amount calculated in accordance with the Individual

Guaranty for the quarter ending December 31, 2023, is equal to $2,500,000.00 such that the Guaranteed Amount equals $4,500,000.00.

28.     Pursuant to the terms of the Individual Guaranty, Feuer, Halpert, Knoll, and M. Knoll Trustee are jointly and severally liable for the aggregate amount of $4,500,000.00, and of that amount, O'Sullivan is jointly and severally liable with those guarantors for the sum of $56,250.00, and C. Feder Trustee is jointly and severally liable for $112,500.00.

29.     Pursuant to the terms of the Housatonic Guaranty, the aggregate obligations of Housatonic are limited to the "Guarantied Amount" equal to the sum of an "Initial Guaranty Amount" of $2,000,000.00, plus the "Adjustment Amount" for the most recently ending fiscal quarter.  The Adjustment Amount calculated in accordance with the Housatonic Guaranty for the quarter ending December 30, 2023 is equal to $2,500,000.00.

30.     Pursuant to the terms of the Housatonic Guaranty, prior to any credits for payments, Housatonic Inv. and Housatonic Aff. are jointly and severally liable for the aggregate of $4,500,000.00.

31.     The Original Credit Agreement was further modified pursuant to the terms of a Second Amendment to Credit Agreement dated as of August 22, 2023, by and among Borrowers, as Borrowers, and Sunflower, as Administrative Agent, (the "Second Amendment").

32.     In the fall of 2023, Sunflower and Borrowers were engaged in discussions regarding a potential third amendment to the Original Credit Agreement, and at Borrowers' request, Sunflower verbally agreed to defer the principal and interest payments due on September 30, 2023 and December 31, 2023 in the aggregate amount of $1,826,466.76. Borrowers and Sunflower were unable to reach an agreement for any third amendment to the Original Credit Agreement.  Thereafter, by letter dated February 6, 2024, Sunflower, by and

through its attorneys, Winstead PC, agreed to further defer the principal portion of the unpaid payments until March 15, 2024, subject to and conditioned upon Borrowers' payment of the unpaid interest portion of the past due payment by 3:00 p.m. on February 6, 2024, which was to be funded by Housatonic. The Original Credit Agreement as modified by the First Amendment, the Second Amendment and the February 6, 2024 letter is referred to herein as the "Credit Agreement."

*Default, Demand and Nonpayment*

33.     Borrowers failed to pay the principal payment due on March 15, 2024, pursuant to the terms of the Credit Agreement. By letter dated March 18, 2024, Sunflower, by and through its attorneys, Winstead PC, provided notice of the Event of Default arising out of Borrowers' failure to pay the principal payment on or before March 15, 2024, as well as additional Events of Default under the Credit Agreement.   In the March 18, 2024 letter, Sunflower made demand upon: (i) Borrowers for the immediate payment in the aggregate amount of $25,767,974.72 representing the principal and interest then due and owing under the Loan; (ii) the Individual Guarantors and Trust Guarantors for the immediate payment of $4,500,000.00 pursuant to the Individual Guaranty; and (iii) Housatonic to pay the remaining amount owed under the Housatonic Guaranty.

34.     Despite such notice and demand, Borrowers failed and refused, and continue to fail and refuse to pay to Sunflower the amounts due and owing under the Loan and Note. Despite such demand, the Individual Guarantors and Trust Guarantors have failed and refused to pay the $4,500,000.00 due and owing pursuant to the Individual Guaranty.  Despite such demand, Housatonic has failed to pay the amounts remaining due under the Housatonic Guaranty.

35.      Sunflower is the owner and holder of the Note, and in its capacity as Administrative Agent, the party entitled to collect and receive all amounts due and owing from Defendants under the Credit Agreement, the Note, the Individual Guaranty and the Housatonic Guaranty and other Loan Documents.

36.      After allowing all just and lawful payments, offsets and credits, there remains due and owing under the Note as of July 10, 2024, the outstanding principal balance of $23,203,250.00, plus accrued but unpaid interest in the amount of $1,358,921.70, plus unpaid late charges and other amounts totaling $355,000.00, with interest continuing to accrue on the outstanding principal balance at the current per diem rate of $6,667.022049. The foregoing does not include attorneys' fees or collection costs incurred by Sunflower.

37.      As noted above, Sunflower engaged Winstead PC to assist it in collecting the indebtedness evidenced by the Note and enforcing Sunflower's rights under the Individual Guarantors the Housatonic Guaranty and other Loan Documents.

*The Feuer Loan and Payment*

38.      In March 2023, Feuer allegedly funded $2 million as a loan to K&H (the "Feuer Loan").[1]

39.      On September 28, 2023, VMC (not K&H) made a payment in the amount of $703,231.17 to Feuer allegedly in partial repayment of the Feuer Loan to K&H (the "Feuer Payment"). The Feuer Payment was funded by an Employee Retention Credit (ERC) refund that VMC received on September 27, 2023.

40.      At the time of the Feuer Payment, Feuer was an insider of VMC, as her husband was the Chief Executive Officer and Chairman of VMC. At the time of the Feuer Payment (as

---

[1] Sunflower has never seen proof of funding for the Feuer Loan and reserves all rights in that regard.

outlined below), VMC was insolvent, a fact Feuer knew or should have known considering her husband's control position at VMC. At the time of the Feuer Payment (as outlined below), VMC had unreasonably small capital in relation to its business and believed, or reasonably should have believed, it would incur debts beyond its ability to pay as they became due.

*The Borrowers' Worsening Financial Condition and Failure*

41.    The Loan was in default almost immediately after it was made as a result of the Borrowers failing a loan covenant test in the first quarterly compliance certificate as of December 31, 2021 (and every subsequent quarter thereafter). Additionally, Borrowers were cash flow and EBITDA negative for at least significant portions of 2022 and 2023 (if not all of 2022 and 2023), notwithstanding that Sunflower was presented financial information in connection with obtaining the Loan that demonstrated the Borrowers had nearly $9,000,000.00 in positive annual EBITDA. And in early 2024 – a little more than two years after the Loan was made – the Borrowers were forced to terminate nearly all employees without notice, shut down all operations on an emergency basis and liquidate.

42.    As represented to Sunflower, VMC's largest assets consist of accounts receivable owed to VMC by K&H. VMC's September 30, 2023, financials listed over $44,000,000.00 in accounts receivable owed to VMC, the vast majority of which was owed by K&H. The K&H accounts receivable now appear worthless and are uncollectible. In fact, the Borrowers even wrote off $30 million of the K&H accounts receivable in the last quarter of 2023 (shortly after making the Feuer Payment). Recognizing that VMC's accounts receivable were almost entirely worthless in September 2023 renders VMC massively insolvent when the Feuer Payment was made.

43.    As Sunflower later learned, the Board and others involved with Borrowers failed to ensure that Borrowers maintained even basic accounting functions or records. There are no or, at best, woefully insufficient records maintained by Borrowers for accounts receivable owing to Borrowers including, but not limited to, the accounts receivable owed by K&H to VMC. Borrowers have been unable to produce something as simple as an accounts receivable aging.

44.    Notwithstanding the foregoing, M. Feuer submitted Compliance Certificates to Sunflower quarter after quarter ensuring that "the financial statements of Borrowers . . . fairly represent in all material respects the financial condition of the Borrowers . . . in accordance with GAAP consistently applied throughout." In retrospect, neither statement is remotely correct.

## CAUSES OF ACTION

### Claims on Note

45.    Borrowers are jointly and severally liable to Sunflower for all of the amounts due and owing under the Note, and Sunflower seeks a judgment from and against Borrowers, jointly and severally, for all such amounts together with pre-judgement interest and post-judgement interest as allowed by law.

### Claim on Individual Guaranty

46.    Pursuant to the terms of the Individual Guaranty, Feuer, Halpert, Knoll, M. Knoll Trustee are jointly and severally liable for the Guaranteed Amount equal to $4,500,000.00, and Sunflower seeks a judgment from and against Feuer, Halpert, Knoll, and M. Knoll Trustee, jointly and severally, for $4,500,000.00 together with pre-judgment interest and post-judgment interest thereon as allowed by law.

47.    Additionally, pursuant to the Individual Guaranty, O'Sullivan is jointly and severally liable with the other Defendants for $56,250.00 of the $4,500,000.00, and Sunflower

seeks a judgment from and against O'Sullivan for that amount together with pre-judgment interest and post-judgment interest thereon as allowed by law.

48.     Additionally, pursuant to the Individual Guaranty, C. Feder Trustee is jointly and severally liable with the remaining Defendants for $112,500.00 of the $4,500,000.00, and Sunflower seeks a judgment from and against C. Feder Trustee for that amount together with pre-judgment interest and post-judgment interest thereon as allowed by law.

### Claim on Housatonic Guaranty

49.     To date Housatonic has made payments under the Housatonic Guaranty in the aggregate amount of $2,706,242.19.

50.     After allowing all just and lawful offsets, payments and credits, pursuant to the terms of the Housatonic Guaranty, Housatonic Inv. and Housatonic Aff. are jointly and severally liable to Sunflower for the sum of $1,793,757.81, and Sunflower seeks a judgment from and against Housatonic Inv. and Housatonic Aff., jointly and severally, for $1,793,757.81, together with pre-judgment interest and post-judgment interest in the amount as allowed by law.

### Attorneys' Fees

51.     Pursuant to the terms of the Credit Agreement, Borrowers agreed to pay to Sunflower all attorneys' fees and collection expenses incurred by Sunflower in enforcing the Loan Documents, and Sunflower seeks a judgment against Borrowers, jointly and severally, for all such fees and expenses in an amount to be established at trial.

52.     Additionally, Pursuant to Texas Civil Practice & Remedies Code §38.001 et. seq., Sunflower is entitled to recover from Borrowers, the Individual Guarantors, the Trust Guarantors and Housatonic, jointly and severally, all attorneys' fees incurred in this proceeding, and Sunflower seeks a judgment from and against Defendants, jointly and severally, for all such attorneys' fees in an amount to be established at trial.

**Fraudulent Transfer**

53.     VMC made the Feuer Payment without receiving reasonably equivalent value for such transfer, and at a time when VMC was insolvent in violation of Texas Business & Commerce Code §24.006(a) (or alternatively, N.Y. Debt. & Cred. Law § 274).

54.     VMC made the Feuer Payment without receiving reasonably equivalent value for such transfer, and was engaged in a business for which its remaining assets were unreasonably small in relation to its business in violation of Texas Business & Commerce Code §24.005(a)(2) (or alternatively, N.Y. Debt. & Cred. Law § 273).

55.     VMC made the Feuer Payment without receiving reasonably equivalent value for such transfer, and intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due in violation of Texas Business & Commerce Code §24.005(a)(2) (or alternatively, N.Y. Debt. & Cred. Law § 273).

56.     VMC made the Feuer Payment to an insider, at a time when VMC was insolvent and Feuer knew or should have known that VMC was insolvent considering her husband's control position at VMC in violation of Texas Business & Commerce Code §24.006(b) (or alternatively, N.Y. Debt. & Cred. Law § 274).

57.     Pursuant to Texas Business & Commerce Code § 24.008 (or alternatively, N.Y. Debt. & Cred. Law § 276), Sunflower seeks to avoid and set aside the Feuer Payment and a judgment from and against Feuer for that amount together with pre-judgment interest, post-judgment interest, costs and attorney's fees as allowed by law.

**CONDITIONS PRECEDENT**

58.     All conditions precedent to the relief requested by Sunflower in this Petition have occurred or have been performed.

## <u>RESERVATION OF RIGHTS</u>

59.    Sunflower reserves all rights and remedies and claims available to Sunflower under the Loan Documents and applicable law, including any additional claims against Defendants, and all rights and remedies with regard to any collateral for the Loan.

WHEREFORE, PREMISES CONSIDERED, Plaintiff Sunflower Bank, N.A. requests that the Defendants VMC Techco, LLC, VMC Billco, LLC, Vascular Management Consultants, LLC, Miriam Feuer, Eliezer Halpert, Abraham Knoll, Crystal O'Sullivan, Miriam Knoll in her capacity as the Trustee of the MF Irrevocable Grantor Trust, Established under the Agreement dated July 3, 2019 and Cheryl Feder in her capacity as the Trustee of the SA2021 Irrevocable Trust Established under the Agreement dated October 8, 2021, Housatonic Equity Investors VII, L.P. and Housatonic Equity Affiliate VII, L.P., each be cited to appear and answer herein, and that upon hearing, Sunflower be awarded a judgment from and against Borrowers for all of the amounts due and owing under the Note, against the Individual Guarantors, the Trust Guarantors and Housatonic for all of the respective amounts owed by each under their respective Guaranties, against all Defendants, jointly and severally, for all attorneys' fees and costs incurred by Sunflower in this proceeding, and a judgment setting aside the fraudulent transfers to Feuer and awarding Sunflower a judgment against Feuer for the amounts received by Feuer and a judgment in favor of Sunflower for Sunflower's costs of suit, for pre-judgment interest and post-judgment interest as allowed by law, and for such other and further relief both at law and in equity as to which it may show itself to be justly entitled.

Respectfully submitted,

**WINSTEAD PC**

By: ___/s/ Brian T. Morris_____
        Brian T. Morris
        State Bar No. 14469600
        bmorris@winstead.com
        Matthew K. Joeckel
        State Bar No. 24110052
        mjoeckel@winstead.com

        500 Winstead Building
        2728 N. Harwood Street
        Dallas, Texas 75201
        (214) 745-5400 / (214) 745-5390 – FAX

**ATTORNEYS FOR PLAINTIFF SUNFLOWER BANK, N.A.**

EXHIBIT "B"

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 44 of 70 PageID #: 44

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

---

ELIEZER HALPERT,

                Plaintiff,

       - against -

ABRAHAM KNOLL, MIRIAM KNOLL, individually and in her capacity as the TRUSTEE OF THE MF IRREVOCABLE GRANTOR TRUST, MARK FEUER, MIRIAM FEUER, SAMUEL ADLER, CHERYL FEDER in her capacity as the TRUSTEE OF THE SA 2021 IRREVOCABLE TRUST, CRYSTAL O'SULLIVAN, 64-57 WOODHAVEN BLVD LLC, 2174 FLATBUSH AVE LLC a/k/a 2174 FB AVE LLC, and 120 HICKSVILLE RD LLC,

                Defendants.

Index No. 612354/24

**FIRST AMENDED COMPLAINT**

---

Plaintiff Eliezer Halpert ("Plaintiff" or "Dr. Halpert"), by and through his attorneys Fryman PC, as and for his first amended complaint against defendants Abraham Knoll, Miriam Knoll, individually, and in her capacity as the Trustee of the MF Irrevocable Grantor Trust, Mark Feuer, Miriam Feuer, Samuel Adler, Cheryl Feder in her capacity as the Trustee of the SA 2021 Irrevocable Trust, Crystal O'Sullivan, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC a/k/a 2174 FB Ave LLC, and 120 Hicksville Rd LLC (collectively, "Defendants"), alleges as follows.

## NATURE OF THE ACTION

1.      This action arises from Dr. Knoll's breach of fiduciary duty and self-dealing against his business partner Dr. Halpert. In a series of transactions and real estate acquisitions, Dr. Knoll engineered an economic "kick-back" scheme whereby he secured additional benefits for himself in violation of his duties to Dr. Halpert, and subsequently misappropriated distributions due to Dr. Halpert from various enterprises in which the parties had an equal partnership, while at the same time using partnership funds to purchase properties in which Dr. Halpert should have participated.

1

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 45 of 70 PageID #: 45

2.      Dr. Halpert and Dr. Knoll were contractual equal partners.  Historically, over the course of their relationship, they have always received equal benefits, profits and distributions from their partnerships.  Or at least that is what Dr. Halpert understood and Dr. Knoll repeatedly told him. What Dr. Halpert has since uncovered is that for years Dr. Knoll has been misappropriating for himself partnership funds, partnership opportunities, and additional ownership interests in shared ventures.  Indeed, after an outside investor, Housatonic, was introduced to the relationship in 2021, Dr. Knoll repeatedly told Plaintiff that they would be receiving equal benefits from the Housatonic transaction, all the while Dr. Knoll and his wife, Miriam Knoll, concealed Dr. Knoll's pattern of self-dealing and conversion from Plaintiff. Ultimately, Defendants secured additional benefits for themselves to Plaintiff's detriment from the Housatonic transaction and from other acquisitions in which the parties were involved.  Plaintiff has been damaged due to Defendants' conduct in excess of millions of dollars.

## THE PARTIES

3.      Plaintiff Eliezer Halpert is an individual residing in Nassau County, New York.

4.      Upon information and belief, Defendant Abraham Knoll ("Dr. Knoll") is an individual residing in Nassau County, New York.

5.      Upon information and belief, Defendant Miriam Knoll (the "Trustee Defendant"), who is also a doctor but did not practice in the medical practices that Plaintiff and Dr. Knoll owned, is an individual residing in New York. Miriam Knoll is the trustee of the MF Irrevocable Grantor Trust ("MF Trust") and is married to Dr. Knoll.

6.      Upon information and belief, defendant Mark Feuer ("Mark") is an individual residing in Nassau County, New York.

2

7.      Upon information and belief, defendant Miriam Feuer ("Miriam Feuer") is an individual residing in Nassau County, New York.

8.      Upon information and belief, defendant Samuel Adler ("Samuel") is an individual residing in Nassau County, New York.

9.      Upon information and belief, defendant Cheryl Feder is an individual residing in New York and is the trustee of the SA 2021 Irrevocable Trust ("SA Trust").  Upon information and belief, defendant Cheryl Feder is related by blood or marriage to Samuel Adler and Samuel Adler and/or his family are the ultimate beneficiaries of the SA Trust.

10.     Upon information and belief, defendant Crystal O'Sullivan ("Crystal"; together with Dr. Knoll, Miriam Knoll, Mark Feuer, Miriam Feuer, Cheryl Feder and Samuel Adler, the "Individual Defendants"), is an individual residing in New York.

11.     Upon information and belief, defendant 64-57 Woodhaven Blvd LLC is a Delaware limited liability company authorized to conduct business in New York State and located in Queens County, New York.  64-57 Woodhaven Blvd LLC transacts business in New York State.

12.     Upon information and belief, defendant 2174 Flatbush Ave LLC is a Delaware limited liability company located in Kings County, New York.  2174 Flatbush Ave LLC is authorized to conduct business in New York State under the name 2174 FB Ave LLC.  2174 Flatbush Ave LLC transacts business in New York State.

13.     Upon information and belief, defendant 120 Hicksville Rd LLC is a Delaware limited liability company authorized to conduct business in New York State and located in Nassau County, New York.  120 Hicksville Rd LLC transacts business in New York State.  (64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC a/k/a 2174 FB Ave LLC and 120 Hicksville Rd LLC are collectively referred to as the "Property Defendants").

3

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction over the Individual Defendants pursuant to CPLR § 301 as they are residents of New York State.

15.     This Court has personal jurisdiction over the Property Defendants pursuant to CPLR § 301 as they are entities authorized to conduct business in New York State, each transacts business in New York State and each owns real property located in New York State.

16.     Venue is proper in this Court pursuant to CPLR § 503 because at least one party resides in Nassau County and a substantial part of the events or omissions giving rise to the claims asserted occurred in Nassau County.

## FACTUAL BACKGROUND

17.     Dr. Halpert and Dr. Knoll each own a fifty percent (50%) equity interest in K&H Medical PLLC, K&H Medical-NJ PLLC, K&H Medical (CT) PLLC, K&H Medical-Phil PLLC and other related entities under the K&H brand (collectively, "K&H").

18.     K&H are medical practices that employ physicians, physician assistants, and nurses that provide medical treatment, and specifically, vascular related treatment, to patients, and that collect revenue from insurance payors and patients.

19.     As 50% partners, Dr. Halpert and Dr. Knoll were entitled to receive an equal share of K&H's revenue distributions.

20.     Miriam Feuer formed Vascular Management Consultants LLC ("VMC"), a company through which Mark provided administrative and back-office services to K&H.

21.     From late 2018 through 2021, Dr. Halpert, Dr. Knoll, and Mark developed a successful business venture together and shared equally – or should have shared equally – the total net proceeds from their respective ventures.

4

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 48 of 70 PageID #: 48

22.     However, unbeknownst to Dr. Halpert at the time, Dr. Knoll and Mark were misappropriating funds at Dr. Halpert's expense and ultimately stole millions of dollars of proceeds.

23.     Dr. Knoll and Mark together formed several other companies through which they paid themselves large-scale kickbacks from K&H, namely VMC Techco LLC ("Techco") and VMC Billco LLC ("Billco").

24.     Dr. Knoll never informed Dr. Halpert of these entities, let alone disclosed that K&H was paying them for trumped up services.

25.     In addition to looting the medical business, Dr. Knoll, Mark, and Miriam Feuer used profits from their ventures – that should have been distributed equally to all three of them – to fund three real estate transactions. However, Dr. Knoll, Mark, and Miriam Feuer structured the transactions to either reduce or eliminate entirely Dr. Halpert's ownership in those properties.

**A.     The Sale**

26.     In late 2021, Dr. Halpert, Dr. Knoll, and Mark agreed to sell just shy of a controlling interest in the business to a private equity company, Housatonic Partners. To effectuate the transaction, the companies were reorganized such that VMC, Techco, and Billco would be wholly owned subsidiaries of a holding company, VMC Holdco LLC ("Holdco"), of which Housatonic Partners (through their affiliated investment vehicles) (collectively, "Housatonic") would now own almost 50% and have the right to exercise effective control.

27.     As a result of the December 2021 Housatonic transaction (the "Housatonic Sale"), Dr. Halpert, Dr. Knoll, Miriam Feuer, the MF Trust, the SA Trust, and Crystal O'Sullivan each received portions of the equity interests in Holdco. Dr. Knoll told Dr. Halpert that he and Dr. Halpert received equal shares of Holdco.  This was false.

28.     The basis for Housatonic's equity investment in Holdco, which itself acquired all the outstanding equity interests in VMC, Billco and Techco, was K&H's contractual relationships with VMC, Billco and Techco, including service agreements to which Plaintiff is a party.  Holdco had no intrinsic value to Housatonic other than those contractual relationships.

29.     VMC continued providing administrative services to K&H as it had done previously pursuant to contracts between K&H and VMC. Dr. Knoll executed these contracts as the managing member of K&H, and Mark Feuer executed these agreements as the CEO of VMC.

30.     The value of these service agreements and other contractual relationships was the basis for Housatonic purchasing an equity interest in Holdco. K&H's contractual relationships with its medical professionals and its contract with VMC were the key component of the value sought by Housatonic in the Housatonic Sale.

31.     The Housatonic Sale also included a release, under the Unit Purchase Agreement (the "Purchase Agreement") section 8.2, which stated in relevant part:

> Effective as of the Closing, each of the Sellers, Mark Feuer, Sam Adler and SPV, on such Person's own behalf and on behalf of such Person's Affiliates, successors, assigns, heirs, administrators and legal representatives (each, a "Seller Releasor"), hereby completely and forever releases, waives and discharges, and shall be forever precluded from asserting, any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, of any kind or nature, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, whether or not hidden or concealed, existing in Law, equity or otherwise, that such Seller Releasor has, had or may have against the business, the Company Group, each of their respective Affiliates (as of the Closing) and their respective directors, officers, employees, management, predecessors, successors, assigns, members, attorneys, accountants, underwriters, investment bankers, financial advisors, appraisers, representatives and agents) (the "Released Parties" and, collectively, the "Released Parties") to the extent based on any act, omission, transaction or other occurrence taking place on or prior to the Closing, including, without limitation, the Reorganization, other than (i) any rights under any of this Agreement or any of the Transaction Documents and (ii) those matters set forth on Schedule 8.2 attached hereto (collectively, the "Surviving Claims"). In making this waiver, each Seller Releasor acknowledges that such Seller Releasor may hereafter discover facts in addition to or different

6

Case 2:25-cv-02193-EK-ST Document 1 Filed 04/21/25 Page 50 of 70 PageID #: 50

from those which such Seller Releasor now believes to be true with respect to the subject matter released herein, but agrees that such Seller Releasor has taken that possibility into account in reaching this Agreement and as to which such Seller Releasor expressly assumes the risk.

32. Dr. Halpert was unaware of, and had never seen, this release when he e-signed the signature page of the Purchase Agreement.

**B.    Dr. Knoll's Self-Dealing in the Housatonic Sale**

33. Dr. Knoll was the point of contact for K&H throughout the negotiations for the Housatonic Sale. He provided information and signed transaction documents as the Managing Member of K&H.

34. Throughout this process, Dr. Knoll told Plaintiff that their total interest in Holdco was equal, which made sense because Plaintiff and Dr. Knoll had always been 50-50 owners of K&H.

35. However, unbeknownst to Plaintiff, Dr. Knoll and Mark negotiated additional compensation for himself, and equally egregious, a substantially higher ownership interest share for himself in the deal.

36. In documents presented to Plaintiff at the time of the closing of the Housatonic Sale, the transaction structure reflected that Plaintiff and Dr. Knoll each had a 12.525% interest share in Holdco.

37. The remaining ownership shares at that time (which have since been adjusted because of a capital call funded by Housatonic) were as follows:

a.    Housatonic, 49.9%;

b.    Miriam Feuer, 17.848125%;

c.    MF Irrevocable Trust, 5.323125%;

d.    SA 2021 Irrevocable Trust, 1.2525%;

7

e. Crystal O'Sullivan, 0.62625%.

38. As a result of post-closing capital call solely funded by Housatonic, the ownership interests in Holdco have been adjusted as follows: Dr. Halpert 11.788063%; Dr. Knoll 11.788063%; Housatonic 52.847746%; Miriam Feuer 16.797990%; MF Irrevocable Trust 5.009927%; SA 2021 Irrevocable Trust 1.178806%; and Crystal O'Sullivan 0.589403%.

39. Miriam Knoll, the trustee of the MF Trust, is married to Dr. Knoll.

40. Upon information and belief, the name of the MF Trust was chosen with the deliberate intention of misleading Plaintiff into believing that the trust represented an additional ownership interest of Miriam Feuer or Mark Feuer.

41. According to Mark, Dr. Knoll threatened to withhold approval for the Housatonic Sale if Dr. Knoll was not granted additional shares in Holdco.

42. Dr. Knoll concealed this from Plaintiff by allocating these additional shares to Miriam Knoll's trust. Indeed, upon information and belief, the trust was created for the sole purpose of perpetuating the fraud. Miriam Knoll is not employed by or affiliated with K&H and has never worked for K&H. There is no legitimate rationale for her receiving any interest share in the Housatonic Sale.

43. At all relevant times, Dr. Knoll owed fiduciary duties to Dr. Halpert as a partner in K&H and as a manager of Holdco.

44. At all relevant times, Dr. Knoll was the managing member of K&H and had a fiduciary duty to Plaintiff. As a fiduciary, Dr. Knoll was required to disclose any and all material facts related to his self-dealing transaction.

8

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 52 of 70 PageID #: 52

45.     Dr. Knoll failed to disclose the additional benefit he negotiated for himself to Plaintiff. Even had he disclosed this information, Dr. Knoll's actions fell well short of his obligation of candor.

46.     Further, Dr. Knoll and Mark failed to disclose the release included in the Purchase Agreement under section 8.2 which included any and all claims relating to challenging the concealment of Dr. Knoll's additional benefit as well as his and Mark's other bad acts set forth herein.

47.     Dr. Knoll's leverage came from the contractual relationships and goodwill of K&H that Housatonic sought to acquire in the Housatonic Sale.

48.     These contractual relationships were based on the contributions and expertise of both Dr. Halpert and Dr. Knoll.

49.     Upon information and belief, the Individual Defendants knew that Dr. Knoll had a fiduciary duty to Plaintiff.

50.     Upon information and belief, the Individual Defendants knew that the allocation of equity to the MF Trust caused Plaintiff to suffer damages.

51.     Plaintiff believed that he and Dr. Knoll were receiving an equal share of interests in Holdco, as they had previously had equal interest shares in K&H. Dr. Knoll repeatedly told Dr. Halpert that they had equal shares in the post-Housatonic Holdco.

52.     However, Dr. Knoll leveraged his position as the K&H member conducting the negotiations to obtain a higher membership interest solely for his own benefit. As the managing member of K&H, he used his negotiating position and leveraged an asset of K&H (namely, K&H's goodwill and contractual relationships) to obtain an additional benefit for himself.

9

53.     Plaintiff was unaware of the disparity in membership interests for which Dr. Knoll negotiated.  Defendants failed to disclose this to Plaintiff.

54.     Samuel Adler, Cheryl Feder in her capacity as the Trustee of the SA 2021 Irrevocable Trust, and Crystal O'Sullivan unjustly received shares in Holdco as a result of the Housatonic transaction. None of these individuals were previously partners in K&H and should never have received shares in Holdco.  Most egregiously, Samuel Adler was in effect a fiduciary for Dr. Halpert, having received bank signatory authorization and signature authorization from Dr. Halpert. Upon information and belief, Samuel Adler, the SA 2021 Irrevocable Trust, and Crystal O'Sullivan each received shares in the Housatonic transaction in exchange for Samuel Adler and Crystal O'Sullivan's assistance in concealing the Knoll-Feuer schemes from Dr. Halpert.

55.     When Dr. Halpert ultimately discovered the fraudulent activities described herein, he also discovered that Mark and Dr. Knoll had formed additional entities and businesses that excluded Dr. Halpert. Endo Distributors LLC was created as a GPO (Group Purchasing Organization) under Dr. Halpert's recommendation to Mark and Dr. Knoll as a means of scaling the business and keeping costs down as well as a potential service provider for other vascular practices. It is unclear whether this entity had any revenue or losses.  This entity was 80% owned by Dr. Knoll and Miriam Feuer.  Dr. Halpert was cut out of this company as well.

56.     Endo Solutions LLC is another entity which is 80% owned by Dr. Knoll and Miriam Feuer.  Dr. Halpert was also not provided any shares in this entity either.  This entity was also created for purposes of a GPO and its operating agreement provides that it serves K&H Medical PLLC, d/b/a Mobile Vascular Physician, a K&H practice owned by Dr. Knoll and Dr. Halpert.  It is also unclear whether this entity had any revenue or losses.  What is clear, however, is that both

10

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 54 of 70 PageID #: 54

entities were designed to outsource services from VMC and to drain funds out of K&H and into the hands of Dr. Knoll.

## C.  Dr. Knoll's Self-Dealing Regarding the Real Estate

57.     In addition to Dr. Knoll's self-dealing in the Housatonic Sale, Dr. Knoll and Mark used funds that Plaintiff was entitled to from his share of K&H's distributions to acquire additional beneficial interests in real property while leading Plaintiff to believe they received equal shares.

58.     Dr. Knoll and Mark formed MVP SPV I LLC in July 2020, and at all relevant times each owned 50% of the company.

59.     The initials "MVP" in this company name were not chosen at random.  MVP is also the initials for Mobile Vascular Physicians, a trade name Plaintiff and Dr. Knoll utilized for the shared practices.  By using the initials MVP, Dr. Knoll and Mark intentionally misrepresented and created the impression that Plaintiff was an equal owner of the entity.  Plaintiff later learned that he had no stake in the company, despite making the same capital contributions as Mark and Dr. Knoll.

60.     MVP SVP I LLC is a member of several LLCs that acquired ownership interest in real properties at locations at which K&H provided clinical services. Plaintiff was involved in bringing to Dr. Knoll the opportunities to purchase several of these properties, several of which were locations where K&H operated its medical practices.  Dr. Knoll utilized the position of trust as Plaintiff's long-time equal partner to steal the opportunities that rightfully belonged to both partners.

61.     For one property Dr. Knoll and Mark reduced Plaintiff's ownership interest, and for two other properties completely excluded Plaintiff from the transactions.

11

62.     MVP SPV I LLC's contributions to and distributions from these transactions came from funds that Plaintiff was entitled to from his share of distributions from K&H.

63.     Throughout these agreements, Dr. Knoll and Mark concealed their ownership percentages and misconduct from Plaintiff.

64.     For example, the ownership interests of 64-57 Woodhaven Blvd LLC, which is the title owner of the property located at 64-57 Woodhaven Blvd., Rego Park, NY, are as follows:

- Abraham Knoll, M.D. (10% owner)
- Eliezer Halpert, M.D. (10% owner)
- Miriam Feuer (10% owner)
- Samuel Adler (5% owner)
- Crystal O'Sullivan (2.5% owner)
- Daniel Stok (2.5% owner)
- MVP SPV I LLC (60% owner)

65.     64-57 Woodhaven Blvd LLC rented the property to the K&H medical practice that operates in that building and the owners of 64-57 Woodhaven Blvd LLC receive that rental income. Because Dr. Knoll has an additional ownership interest in the entity via his 50% interest in MVP SPV I LLC, Dr. Knoll receives additional rental income from the property that should have been shared equally with Dr. Halpert.  The mortgage obtained to purchase the property was guaranteed by K&H Medical, and the remaining purchase price as well as $1.5 million in renovations to the property were funded by K&H and VMC.

66.     Mark and Dr. Knoll told Plaintiff that his ownership percentage in 64-57 Woodhaven Blvd LLC was identical to Dr. Knoll's ownership percentage. However, Dr. Knoll retained a larger ownership percentage due to his ownership in MVP SPV I LLC, which Plaintiff did not share, and which Dr. Knoll concealed from Plaintiff.

67.     Dr. Halpert was specifically excluded from ownership in the two other properties at issue.  First, 2174 Flatbush Ave LLC is the title owner of the property located at 2174 Flatbush

12

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 56 of 70 PageID #: 56

Ave, Brooklyn, NY. This property was first identified by Dr. Knoll and was then vetted by Dr. Halpert. The loan obtained for purchase of this property was guaranteed by K&H Medical and VMC and Dr. Knoll signed the loan agreements on behalf of K&H Medical. 2174 Flatbush Ave LLC rented the property to the K&H medical practice that operates in that building and the owners of 2174 Flatbush Ave LLC receive that rental income. MVP SPV I LLC is an 82.5% owner of 2174 Flatbush Ave LLC and, as a result of his 50% interest in MVP SPV I LLC, Dr. Knoll receives rental income from the property, none of which is shared with Dr. Halpert.

68.      Second, 120 Hicksville Rd LLC is the title owner of the property located at 120 Hicksville Road, Bethpage, NY in which the headquarters for Mobile Vascular Physicians and K&H was located. It was Dr. Halpert's idea to purchase a property for K&H's headquarters. MVP SPV I LLC is a 60% owner of 120 Hicksville Rd LLC and Dr. Halpert has no ownership interest in 120 Hicksville Rd LLC. Both Dr. Knoll and Miriam Feuer each directly own an additional 10% of 120 Hicksville Rd LLC, thus effectively each owning 45% of the entity. 120 Hicksville Rd LLC obtained a mortgage in 2020 for $1.6 million which was guaranteed by K&H Medical and VMC. As the property was acquired for $2.375 million, it is without doubt that the remaining purchase price was directly and indirectly funded by K&H. For these two properties, Dr. Halpert was first robbed of the properties themselves, and now Dr. Knoll is utilizing the stolen properties to drain funds from K&H via rental payments.

69.      Dr. Knoll handled the transactions for these properties and utilized his position of trust to appropriate these opportunities for himself and to Plaintiff's exclusion.

70.      Upon information and belief, Dr. Knoll utilized misappropriated distributions from K&H to purchase these properties, and further benefited to Plaintiff's detriment by collecting distributions from these properties worth hundreds of thousands of dollars.

13

Case 2:25-cv-02193-EK-ST   Document 1   Filed 04/21/25   Page 57 of 70 PageID #: 57

71.     Samuel Adler and Crystal O'Sullivan unjustly received ownership interests in the real properties at issue in this action through their ownership in the Property Defendants. Neither of these individuals should have received such ownership interests as they did not contribute anything to the purchase of the real properties and were never partners in the K&H businesses. Upon information and belief, Samuel Adler and Crystal O'Sullivan each received shares in the real properties at issue in exchange for Samuel Adler and Crystal O'Sullivan's assistance in concealing the Knoll-Feuer schemes from Dr. Halpert.  If Samuel Adler and Crystal O'Sullivan received any distributions as a result of such ownership interests, those distributions were also unjustly received.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Fiduciary Duty – Dr. Knoll)**

72.     Plaintiff repeats each of the allegations of the preceding paragraphs.

73.     At all times relevant to this action Dr. Knoll owed a fiduciary duty to Plaintiff.

74.     Dr. Knoll breached his fiduciary duties through his self-dealing in the Housatonic Sale and his failure to disclose the additional membership share allocated to his wife's trust.

75.     Dr. Knoll conducted the negotiations on behalf of Dr. Halpert for the Housatonic Sale and instead of acting with Dr. Halpert's best interests, Dr. Knoll had only his own interests in mind and, in violation of his fiduciary duties to Plaintiff, obtained for himself a greater share of Holdco in the Housatonic Sale.  At the Housatonic Sale's closing, Dr. Knoll (individually and via his wife's trust) owned 17.848125% of Holdco, whereas Dr. Halpert owned 12.525%.  Dr. Knoll concealed this from Dr. Halpert by assigning to himself directly the exact same percentage of ownership in Holdco as Dr. Halpert, but concealing the additional ownership percentage he obtained behind the "MF Trust" façade and pretending that the trust belonged to Mark or Miriam Feuer.  This resulted in a reduction of the purchase payout that Dr. Halpert received in excess of

14

$2.5 million as well as a diminution of value of the equity that Dr. Halpert received of more than $1 million.

76.     Dr. Knoll further breached his fiduciary duties by using funds that should have been allocated to Plaintiff as distributions to purchase real estate, and by securing additional profits through his ownership shares in MVP SPV I LLC.  Dr. Knoll completely excluded Plaintiff from ownership in several real properties.

77.     Dr. Knoll further breached his fiduciary duties by obtaining K&H funds for himself, and to Plaintiff's detriment, as a result of Dr. Knoll's ownership, and involvement in the schemes surrounding the formation and operation of Endo Distributors LLC, Endo Solutions LLC, Techco and Billco.

78.     Dr. Knoll further breached his fiduciary duties to Plaintiff by failing to disclose the existence of the release in the transaction documents for the Housatonic transaction when he requested that Plaintiff execute the Purchase Agreement.  Dr. Knoll's now transparent intent was to shield himself from any liability should Plaintiff later discover the length and breadth of Dr. Knoll's bad acts. The release was not made fairly and knowingly and should not be enforced.

79.     As a result of Dr. Knoll's actions, Plaintiff has suffered damages in an amount to be determined at trial, but believed to exceed $7.5 million.

80.     Because Dr. Knoll's actions were deliberate, willful, and without justification, Plaintiff is also entitled to punitive damages, in an amount to be determined by the Court, but not less than $10 million.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Aiding and Abetting Breach of Fiduciary Duty –
### Miriam Knoll, Miriam Feuer, and Mark Feuer)

81.     Miriam Knoll, Miriam Feuer, and Mark knew that Dr. Knoll had a fiduciary duty to Plaintiff.

82.     Miriam Knoll, Miriam Feuer, and Mark aided Dr. Knoll in the allocation of membership shares to her irrevocable trust, which was a breach of Dr. Knoll's fiduciary duty to Plaintiff.

83.     Miriam Knoll, Miriam Feuer, and Mark knew that this was a breach of fiduciary duty to Plaintiff.

84.     Mark aided Dr. Knoll's breach of his fiduciary duty to Plaintiff by failing to advise, and actively concealing from, Plaintiff of the inclusion of the release in the Purchase Agreement.

85.     Mark knew that this was a breach of fiduciary duty to Plaintiff.

86.     As a result of their actions, Plaintiff has suffered damages in an amount to be determined at trial, but believed to exceed $7.5 million

## AS AND FOR A THIRD CAUSE OF ACTION
### (Fraud – Dr. Knoll)

87.     Plaintiff repeats each of the allegations of the preceding paragraphs.

88.     Dr. Knoll had a fiduciary duty to Plaintiff.

89.     Dr. Knoll had a duty to disclose material information about the Housatonic Sale to Plaintiff.

90.     Dr. Knoll repeatedly told Plaintiff that they would receive equal membership shares in Holdco as part of the Housatonic Sale, when in fact Dr. Knoll negotiated for his wife's trust to receive membership shares and receive additional benefits in the Housatonic Sale and then concealed it by naming the trust with the same initials as Mark Feuer and Miriam Feuer.

16

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 60 of 70 PageID #: 60

91.     Dr. Knoll had a duty to disclose to Plaintiff material information about K&H distributions.

92.     Dr. Knoll misappropriated K&H distributions that were due to Plaintiff in order to acquire additional interests in real property.

93.     Dr. Knoll intended to deceive Plaintiff regarding the distribution of membership interests in the Housatonic Sale.

94.     Dr. Knoll intended to deceive Plaintiff regarding the K&H distributions and Dr. Knoll's use of these distributions.

95.     By reason of Dr. Knoll's actions, Plaintiff has suffered damages in an amount to be determined at trial, but believed to exceed $7.5 million

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Fraud – Dr. Knoll and Mark Feuer)**

96.     Plaintiff repeats each of the allegations of the preceding paragraphs.

97.     Dr. Knoll and Mark failed to disclose material information about the Purchase Agreement when they had Dr. Halpert sign the Purchase Agreement.

98.     Dr. Knoll had a duty to disclose complete and accurate information about the Purchase Agreement to Dr. Halpert because the Defendant owed a fiduciary duty to Dr. Halpert. Specifically, Dr. Knoll was the Plaintiff's fiduciary because Dr. Knoll represented Dr. Halpert's interest in K&H and negotiated on Dr. Halpert's behalf for both the Purchase Agreement and the Housatonic Sale writ large.

99.     Mark and Dr. Knoll had a duty to disclose complete and accurate information about the Purchase Agreement because Mark and Dr. Knoll had special knowledge of the information held within the Purchase Agreement because Mark negotiated the transaction with Housatonic on behalf of K&H and Dr. Knoll negotiated on behalf of Dr. Halpert. Dr. Halpert could not have

17

discovered this information, and therefore Mark and Dr. Knoll's failure to disclose complete and accurate information about the Purchase Agreement rendered the parties' transaction inherently unfair.

100.    Mark and Dr. Knoll had a duty to disclose complete and accurate information about the Purchase Agreement to Dr. Halpert because Mark and Dr. Knoll conveyed incomplete information to Dr. Halpert when omitting the parties' true ownership percentages. This incomplete information was misleading because the release then included claims with respect to the inequitably skewed ownership percentages, thereby giving rise to Mark and Dr. Knoll's duty to correct this misimpression by providing complete and accurate information.

101.    Mark and Dr. Knoll had a duty to disclose complete and accurate information about the Purchase Agreement to Dr. Halpert because Mark and Dr. Knoll actively thwarted Dr. Halpert's ability to learn the truth by disguising the MF Trust as an ownership interest for Mark rather than Dr. Knoll, thereby giving rise to Mark and Dr. Knoll's duty to disclose the information they sought to keep concealed.

102.    Mark and Dr. Knoll knew the ownership percentages, and the claims arising from misrepresenting each parties' ownership, were material information Dr. Halpert required for signing the Purchase Agreement and agreeing to the release itself.

103.    Mark and Dr. Knoll omitted, concealed, and failed to disclose the true ownership percentages within the Purchase Agreement, and therefore the release of any claims arising out of their omission, concealment, and failure to disclose the true ownership percentages to deceive Dr. Halpert into believing there were equal percentages. As a result, their omission, concealment, and

failure to disclose the ownership percentages deceived Dr. Halpert into believing the release did not include his claims related to the inequitable skewed ownership percentages.

104.    Indeed, Dr. Halpert was never provided with a final draft of the Purchase Agreement.  Instead, on December 30, 2021 – the day before the closing – Dr. Halpert received an email from Garfunkel Wild, the law firm representing the sellers in the Housatonic transaction, requesting that Dr. Halpert "Docu-Sign" signature pages for the Purchase Agreement, which email was followed by phone calls from Dr. Knoll, Sam Adler and Chris Thomas (VMC's lawyer), requesting that Dr. Halpert sign the signature pages immediately as the closing of the transaction was the next day.  At the same time, Dr. Halpert was also receiving other "Docu-Sign" emails with other signature pages for the other documents that needed to be executed for the Housatonic transaction.  All the emails were received by Dr. Halpert in the afternoon and evening of December 30, 2021.  Upon information and belief, there was a time-crunch element that had been introduced by Defendants so that Dr. Halpert would not discover the true ownership percentages issued for the Housatonic transaction or the release in the Purchase Agreement.  Dr. Halpert was actively involved in clinical duties on December 30, 2021 and December 31, 2021, while Dr. Knoll was representing Dr. Halpert on the business end.

105.    The "Docu-Sign" emails contained 42 pages of signature pages for execution. None of the signature pages were sent with the documents for which they relate.

106.    Additionally, the "Docu-Sign" process does not lend itself to a regular view of the pages being signed.  When Dr. Halpert received the emails, he clicked "next" to apply his signature and the Docu-Sign app immediately brings the view to the precise place on the page where the signature is being affixed.  It does not show other signature blocks on that page or other pages, or other portions of the document (of course, here, Dr. Halpert never received the rest of the

19

document).  There are a series of additional "next" buttons that must be clicked to affix a signature. Dr. Halpert had no opportunity to seek out and obtain and review the Purchase Agreement itself, which is nearly 100 pages, nor the hundreds of other pages that include the schedules and other assorted documents that had to be executed in connection with the Housatonic transaction.  Nor did he have any reason to do so, as he was relying completely on his partner, Dr. Knoll, who had handled the negotiations with Housatonic until then on Dr. Halpert's behalf.

107.    In March 2024, Dr. Halpert received a letter from Sunflower Bank concerning an outstanding loan issued in connection with the Housatonic transaction. That letter was addressed to Elizabeth Halpert, although there is no such person.  The letter itself referenced Miriam Knoll's ownership of the MF Trust, even though Dr. Knoll had repeatedly told Dr. Halpert that the MF Trust was Miriam Feuer's interest in the Housatonic transaction.  Thinking that the bank's reference to "Elizabeth Halpert" and "Miriam Knoll" were simply indications of sloppiness on the bank's part, Dr. Halpert messaged Dr. Knoll on March 19, 2024 stating: "Why do they have Miriam Knoll down as one of the guarantees on the loan?"  Dr. Knoll's response was "I dunno."  This was the first instance that Dr. Halpert had any indication of the true ownership of the MF Trust and it

Case 2:25-cv-02193-EK-ST Document 1 Filed 04/21/25 Page 64 of 70 PageID #: 64

was shortly afterwards that Dr. Halpert began to learn the scope of the massive fraud Dr. Knoll, and others, had done to him.

108.    Dr. Halpert had no knowledge of Miriam Knoll's interest in the MF Trust prior to receiving this communication from the bank.

109.    The release included both known and unknown injuries.

110.    Plaintiff had no knowledge of the existence of the release when he signed the Purchase Agreement.

111.    As a direct and proximate result of relying on Mark and Dr. Knoll's misleading use of the MF Trust, and their omission of providing this information to Dr. Halpert, Dr. Halpert was damaged by releasing claims that were concealed from him, in an amount to be determined at trial.

112.    Mark and Dr. Knoll's fraudulent concealment, inducing Dr. Halpert's reliance, was the direct and proximate cause of Dr. Halpert's loss, which Dr. Halpert would not have sustained but for Mark and Dr. Knoll's fraud.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Conversion – Dr. Knoll and Mark Feuer)**

113.    Plaintiff repeats each of the allegations of the preceding paragraphs.

114.    Dr. Knoll and Mark misappropriated distributions that Plaintiff was entitled to receive from the Housatonic Sale.

115.    Dr. Knoll and Mark used the misappropriated distributions to acquire interests in real property which opportunities should have been shared equally with Plaintiff.

116.    Dr. Knoll and Mark concealed the nature of their ownership interests through their use of MVP SPV I, LLC as an interest holder in the property.

21

Case 2:25-cv-02193-EK-ST   Document 1   Filed 04/21/25   Page 65 of 70 PageID #: 65

117.    Dr. Knoll and Mark led Plaintiff to believe that they owned equal shares in certain real property, when Dr. Knoll in fact secured additional membership interest for himself through his ownership in MVP SPV I, LLC.

118.    Dr. Knoll and Mark converted funds that should have been allocated to Plaintiff as distributions to purchase real estate, and obtained additional profits through their ownership shares in MVP SPV I LLC.

119.    Dr. Knoll and Mark interfered with Plaintiff's right to the LLC distributions.

120.    By reason of Dr. Knoll and Mark's actions, Plaintiff has suffered damages in an amount to be determined at trial, but believed to exceed $7.5 million.

### AS AND FOR A SIXTH CAUSE OF ACTION
**(Unjust Enrichment – Dr. Knoll, Miriam Feuer, Mark Feuer, MF Trust, Cheryl Feder, Samuel Adler and Crystal O'Sullivan)**

121.    Plaintiff repeats each of the allegations of the preceding paragraphs.

122.    Dr. Knoll, Miriam Feuer, Mark, MF Trust, Cheryl Feder and Crystal were unjustly enriched by the receipt of shares in Holdco as a result of the Housatonic Sale.

123.    Dr. Knoll, Miriam Feuer, Mark, MF Trust, Cheryl Feder and Crystal were unjustly enriched by the receipt of distributions issued as a result of the Housatonic Sale.

124.    It would be against equity and unjust to allow Dr. Knoll, Miriam Feuer, Mark, MF Trust, Cheryl Feder and Crystal to retain the benefits they have received as a result of the Housatonic Sale.

125.    Dr. Knoll, Miriam Feuer, Mark, Samuel, Crystal and MF Trust were unjustly enriched by the receipt of shares or additional shares in the real estate entities.

126.    Dr. Knoll, Miriam Feuer, Mark, Samuel, Crystal and MF Trust were unjustly enriched by the receipt of distributions or additional distributions from the real estate entities.

22

127. It would be against equity and unjust to allow Dr. Knoll, Miriam Feuer, Mark, Samuel, Crystal and MF Trust to retain the benefits or additional benefits they received from the real estate entities.

128. Dr. Knoll and Mark were unjustly enriched by the receipt of funds arising from the kickback scheme involving Techco and Billco.

129. It would be against equity and unjust to allow Dr. Knoll and Mark to retain the additional benefits they received from the kickback scheme involving Techco and Billco.

130. Accordingly, Plaintiff is entitled to damages in an amount to be proven at trial but believed to exceed $7.5 million.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Constructive Trust – Property Defendants)

131. Plaintiff repeats each of the allegations of the preceding paragraphs.

132. Plaintiff and Dr. Knoll shared equal ownership of K&H.

133. At the time that the properties were purchased, Plaintiff, Dr. Knoll, and Miriam Feuer each received equal distributions from the combined venture.

134. If the properties had not been purchased, the money used to fund them would have been distributed equally to all three of them.

135. Dr. Knoll told Plaintiff that they had equal ownership shares in 64-57 Woodhaven Blvd LLC. This was false.

136. For two other entities, 2174 Flatbush Ave LLC and 120 Hicksville Rd LLC, Plaintiff was cut out completely. This was in spite of the fact that Plaintiff was involved in introducing the ideas and the opportunities to Dr. Knoll and K&H, that the entities own properties in which K&H operates and collects rent from K&H and therefore these were K&H opportunities

23

Case 2:25-cv-02193-EK-ST   Document 1   Filed 04/21/25   Page 67 of 70 PageID #: 67

that should have been shared by all the K&H owners, and that the properties were purchased in part with K&H funds.

137.     The Property Defendants effectively used Plaintiff's funds to purchase the real properties without him.

138.     Plaintiff has as much right to the real properties as do the Property Defendants.

139.     Plaintiff lacks an adequate remedy at law.

140.     By reason of the foregoing, Plaintiff is entitled to an ownership interest in each of the properties located at 64-57 Woodhaven Blvd in Queens, 2174 Flatbush Ave in Brooklyn, and 120 Hicksville Rd in Hicksville, as well as an accounting of all funds that the Property Defendants received from these properties.

<u>**AS AND FOR A EIGHTH CAUSE OF ACTION**</u>
**(Accounting – Dr. Knoll and Miriam Feuer)**

141.     Plaintiff repeats each of the allegations of the preceding paragraphs.

142.     Upon information and belief, Dr. Knoll misappropriated funds from K&H and other entities in which Plaintiff and Dr. Knoll share ownership and has kept for himself distributions to which Plaintiff was entitled.

143.     Upon information and belief, Dr. Knoll and Miriam Feuer misappropriated funds from MVP SPV I, LLC, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC and 120 Hicksville Rd LLC, to the benefit of Dr. Knoll and Miriam Feuer and to Plaintiff's detriment.

144.     Upon information and belief, Dr. Knoll and Miriam Feuer has used misappropriated funds to acquire interests in real property and exclude Plaintiff from ownership of the properties.

145.     Plaintiff has requested a full accounting for all activities of these entities and properties but no such accounting has been provided.

24

Case 2:25-cv-02193-EK-ST   Document 1   Filed 04/21/25   Page 68 of 70 PageID #: 68

146.   Dr. Knoll and Miriam Feuer should be compelled to account for all funds received and distributed by K&H Medical PLLC, K&H Medical-NJ PLLC, K&H Medical (CT) PLLC, VMC Techco LLC, VMC Billco LLC, Vascular Management Consultants LLC, VMC Holdco LLC, MVP SPV I, LLC, Endo Distributors LLC, Endo Solutions LLC, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC a/k/a 2174 FB Ave LLC, and 120 Hicksville Rd LLC.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

i.   on the First Cause of Action, a judgment of this Court for the damages Plaintiff has suffered in an amount to be determined at trial, but believed to exceed $7.5 million;

ii.   on the Second Cause of Action, a judgment of this Court for the damages Plaintiff has suffered in an amount to be determined at trial, but believed to exceed $7.5 million;

iii.   on the Third Cause of Action, a judgment of this Court for the damages Plaintiff has suffered in an amount to be determined at trial, but believed to exceed $7.5 million;

iv.   on the Fourth Cause of Action, a judgment of this Court for the damages Plaintiff has suffered in an amount to be determined at trial, but believed to exceed $7.5 million;

v.   on the Fifth Cause of Action a judgment of this Court for the damages Plaintiff has suffered in an amount to be determined at trial, but believed to exceed $7.5 million;

25

Case 2:25-cv-02193-EK-ST    Document 1    Filed 04/21/25    Page 69 of 70 PageID #: 69

vi.   on the Sixth Cause of Action, a judgment of this Court for the amount by which Defendants have been unjustly enriched in an amount to be determined at trial, but believed to exceed $7.5 million;

vii.  on the Seventh Cause of Action, for a constructive trust in Plaintiff's favor on Defendants' ownership interest in VMC Holdco LLC, MVP SPV I, LLC, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC and 120 Hicksville Rd LLC, an equitable portion in ownership of the real properties located at 64-57 Woodhaven Blvd., Rego Park, NY, 2174 Flatbush Ave, Brooklyn, NY and 120 Hicksville Road, Bethpage, NY equal to Dr. Knoll's ownership interest, as well as all distributions and payments Defendants have received from these entities and a declaration that Plaintiff's and Dr. Knoll's ownership interest in the three real properties are equal;

viii. on the Eighth Cause of Action, for an accounting of the assets, liabilities and activities of K&H Medical PLLC, K&H Medical-NJ PLLC, K&H Medical (CT) PLLC, VMC Techco LLC, VMC Billco LLC, Vascular Management Consultants LLC, VMC Holdco LLC, MVP SPV I, LLC, Endo Distributors LLC, Endo Solutions LLC, 64-57 Woodhaven Blvd LLC, 2174 Flatbush Ave LLC and 120 Hicksville Rd LLC;

ix.   punitive damages in an amount to be determined by the Court but not less than $10 million;

x.    granting attorney's fees, costs, and statutory interest; and

xi.   granting such other and further relief as this Court deems just and proper.

Case 2:25-cv-02193-EK-ST   Document 1   Filed 04/21/25   Page 70 of 70 PageID #: 70

Dated: November 12, 2024

**FRYMAN PC**


By: _____*s/  David Yeger*_____
    David Fryman
    David Yeger
10 East Merrick Road, Ste. 304
Valley Stream, NY 11580
(516) 714-4147
dfryman@frymanpc.com
dyeger@frymanpc.com
*Attorneys for Plaintiff*

27